**PENN CENTRAL TRANSPORTATION COMPANY, a corporation of the Commonwealth of Pennsylvania, et al., Plaintiffs,**

v.

**UNITED STATES of America, and American Dredging Company, a Pennsylvania corporation, Defendants.**

**Civ. A. No. 4382.**

United States District Court,
D. Delaware.

Nov. 15, 1973.

Robert K. Payson, and Peter M. Sieglaff, Wilmington, Del., for plaintiffs.

Ralph F. Keil, U. S. Atty., Wilmington, Del., John J. McLaughlin, United States Dept. of Justice, Washington, D. C., for defendant, United States.

Raymond T. Letulle, and James F. Young, Philadelphia, Pa., and Prickett, Ward, Burt & Sanders, Wilmington, Del., of counsel, for defendant American Dredging Co.

## OPINION

EDWIN D. STEEL, Jr., District Judge..

This is an action in admiralty brought by the Trustees of Penn Central Transportation Company ("Penn Central") to recover damages incurred as the result of the cutting or damaging of 10 submarine electrical cables ("submarine cables") which supplied electrical power, and control and communication signals

for the operation of Penn Central's vertical lift bridge over the Chesapeake and Delaware Canal ("C & D Canal"). The action against each defendant is based on negligence, and, in addition, Penn Central has a contractual claim against the United States of America ("United States"). American Dredging Company ("American Dredging") has filed a counterclaim against Penn Central based on negligence, and a cross-claim against the United States for indemnity or contribution (if American Dredging should be held liable to plaintiff) based on negligence and breach of contract, and in addition a claim for damages against the United States based on its alleged negligence or improper performance. The United States has filed a cross-claim against American Dredging for indemnity based on negligence and breach of contract.

Jurisdiction is conferred by 28 U.S.C.. § 1333 and 46 U.S.C. § 740 et seq. The facts which give rise to admiralty jurisdiction are that on August 26, 1971, during dredging operations in the C & D Canal (a navigable waterway) conducted by American Dredging (pursuant to a contract between American Dredging and the United States) and supervised by the United States, plaintiff's submarine cables were cut and damaged by the dredge *American,* which was owned and operated by American Dredging.

On March 28, 1962, the United States and the Pennsylvania Railroad Company ("the PRR") (the predecessor of the Penn Central, et al.) [1] and the Delaware Railroad Company entered into a contract ("Bridge Contract") in connection with the relocation of the C & D Canal, pursuant to which a new vertical lift railroad bridge was to be constructed by the United States and at its expense over the relocated section of the canal. The contract project was authorized by Public Law 780, 83d Congress, as implemented by Senate Document No. 123, 83d Congress, 2d Session.

By the terms of the Bridge Contract, the United States was obligated to afford the PRR the opportunity to review and comment upon the design of the new bridge during its preparation, and final plans and specifications were subject to the approval of the PRR. The contract also provided that the United States and the PRR could inspect the construction work at any time during its progress and make a final inspection upon completion. Acceptance of title was subject to the PRR's approval. The contract provided that after acceptance by the PRR and opening of the relocated channel to navigation, the PRR was to operate and maintain the bridge without cost to the United States except that the United States was to provide for all unusual maintenance of bridge piers such as damage caused by construction and maintenance of the relocated channel or by canal traffic.

In connection with the Bridge Contract and in furtherance of fulfilling it, the United States entered into two subcontracts to neither of which plaintiff was a party. One was with Ingalls Iron Works Company ("Ingalls") and the other was with Nello L. Teer Company and Construction Aggregates Corporation, a joint venture ("Teer").

*Contract dated March 13, 1963 between the United States and Ingalls*

Under this contract Ingalls undertook to construct for the United States the new vertical lift railroad bridge over the relocated section of the C & D Canal and agreed to furnish and install submarine cables essential to the normal and emergency operation of the bridge. Part II, Article 6–40.j of the Ingalls contract provided, *inter alia*:

"The [submarine] cables shall cross the channel to the west of the movable span in a trench where shown on the contract drawings. The trench will be excavated by others to a width at the bottom of approximately 10'–0", with

---

1. It is agreed that all obligations and rights of the PRR are now the obligations and rights of the plaintiff.

side slopes approximately 1:1. The bottom of the trench will be at Elev. —45.0 for the 500′–0″ channel width and sloping up each bank to a point approximately 5′–0″ below the final ground line at the shore side of each tower pier. The trench will be fully excavated on or about 31 August 1964, and will be kept open for 10 calendar days before backfilling (by others).

\* \* \* \* \* \*

The Contractor shall furnish a diver and the necessary diving equipment to ascertain that the cable trench excavated by others is of the proper dimensions and clear of any obstructions. If for any reason the trench has to be altered or cleared the Contractor shall report this to the Contracting Officer so that it may be altered or cleared by others. The diver shall see that all cables are properly placed. The Contractor shall make the diving equipment available for use of the Contracting Officer or his representative in making inspections of the cable installation. The Contractor's diver shall operate the equipment when being used by the Contracting Officer or his representative.

The submarine cables shall be fastened to the face of the tower piers with approved clamps as shown on the contract drawings."

*Contract dated February 16, 1962 between the United States and Teer*

This obligated Teer to dig the new relocated section of the canal, to construct the bridge piers and to excavate the cable trench. In connection with its obligation to excavate the cable trench, the Teer contract provided that the centerline of the cable trench was to be located 130′ west of the centerline of the new vertical life bridge and was to be executed as "shown on the contract drawings". These drawings, drawn and approved by the Corps of Engineers ("Corps") acting on behalf of the United States, specified that the bottom of the trench would be 45′ deep and would be approximately 460′ long.[2] (Px 25; Tr. 43–45)

The excavation of the cable trench was begun by Teer in December 1964 after the new canal channel had been dredged to a depth of approximately 29′ (Tr. 338–339), and was substantially completed on or about January 20, 1965, with the exception of some supplemental work, including "spot dredging", on January 21–22, 1965. Immediately after the trench was excavated, the Corps measured its depth by taking fathometer soundings at 20′ intervals along the trench bottom on January 20–21. In the vicinity of the cable trench, the current and bottom conditions of the channel were such that taken together, in connection with the steep side slopes of the trench, a strong likelihood of shoaling[3] existed and in fact occurred. (Tr. 249–250, 353; Px 111, pp. 27–29) The greatest tendency toward shoaling existed at the point where the cable trench met the side slopes of the canal. (Tr. 391)

The extent of this shoaling is manifest by the fathometer soundings taken by the Corps on January 20–21 in the then existing 29′ channel.[4]

---

2. While the depth of the trench specified as 45′ corresponded with the depth specified in Part II, Article 6–40.j. of the Ingalls contract, the 460′ length of the trench specified in the Teer contract drawings was less than the 500′ length of the trench specified in the Ingalls contract.

3. Shoaling is the accumulation of mud, sand and other material in the channel which makes the channel (including the trench) more shallow.

4. All locations hereinafter noted in the text are with reference to the 35′ channel which was the subject of the 1971 contract between the United States and American

Dredging (see text *infra*). At the time when the 1965 fathometer soundings were taken, however, the channel was at a depth of 29′. The physical locations of these fathometer soundings as represented on Px 100–103, therefore, were based upon the then existing 29′ channel. To fix their locations hypothetically with reference to the centerline of the 35′ channel, 111′ must be added to measurements along the trench south of the centerline of the 29′ channel. (PO p. 4). Exhibits ADX 21a and 21b clearly show the relationship between the 29′ channel locations and the 35′ channel locations of these fathometer soundings.

These soundings reveal that the cable trench south of the centerline of the 35′ channel was not at the contract depth of 45′ on January 21, 1965, at each of the points sounded on that day. Furthermore, a comparison of the soundings taken on January 20 and 21 indicates that rapid shoaling was indeed occurring in the cable trench. Two exhibits, ADX 21a and 21b, in particular support these findings. They show that on January 20 at a point 211′ south of the centerline of the 35′ channel the deepest point in the cable trench was approximately 48′. Shoaling was so rapid that one day later, on January 21, the soundings show that at the same point the trench was less than 43′ deep. In addition, on January 21, the soundings indicate that at a point 191′ south of the centerline of the 35′ channel the trench was between 43.-7′–44′ deep, at a point 231′ south of the centerline of the 35′ channel the trench was between 43.2′–43.8′ deep, and at a point 251′ south of the centerline of the 35′ channel the trench was between 35.-7′–36.9′ deep. Thompson A. Lyon, who at all relevant times was the Corps' construction inspector with regard to the cable trench and whose responsibility it was to ensure that the cable was placed at the right depth and location, testified that he personally saw the soundings which, as he conceded, showed that the trench was not 45′ deep for its entire length. Accordingly, the cable trench was clearly not 45′ deep for a distance 250′ south of the centerline of the 35′ channel prior to the cables being laid.

The sounding rolls for the fathometer soundings taken on January 20 and 21, which have been produced by the United States are the only such sounding rolls known to be in existence. They are the only such sounding rolls that the Assistant Resident Engineer of the Corps, N. J. Barbieri, could recall having reviewed. So far as the record discloses there were no fathometer soundings taken by the Corps or anyone else south of the centerline of the channel between January 22, 1965 and the date when the cables were laid. After the excavation was completed and before the cables were laid, a diver employed by W. V. Pangborne & Co. ("Pangborne"), a subcontractor of Ingalls acting pursuant to the Ingalls contract with the United States, inspected parts of the trench to ascertain whether it was of the proper dimension and clear of obstructions. The diver, however, was not told to make any measurements to determine the depth of the trench nor did he attempt to do so. He likewise made no attempt to measure the length of the trench.

On January 22, 1965, Ingalls, through its subcontractor Pangborne, began to install the submarine cables across the canal from the north bank.

The installation of the cables was begun only after the Corps had approved the excavation of the trench and had given Kolb, an employee of Pangborne, the right to proceed with the laying of the cables. The cables were on reels on a barge and were laid into the water by extending them over a pontoon tied to the stern of the barge as the barge pulled southward across the canal. On January 22, the cables were laid from the north bank across the canal to a point that was 15′ to 20′ north of the south limit of the channel. The bow of the barge was beached approximately 5′ from the south bank of the canal. The unlaid cables were left on the barge until the cable laying operation was resumed on January 25; hence, for at least three days the cables hung down from the barge and touched the bottom of the trench to a point 15′ to 20′ inside the southern edge of the channel where the greatest probability of shoaling existed.

On January 23, diver inspection was conducted by Pangborne on the part of the cable laying operation which had been completed on January 22. He confirmed that the laying of the cable had been completed on the 22nd only to a point somewhere north of the south side of the canal. There was no diver inspection of the cable installation performed after January 23.

On or about January 26, 1965 through February 10, 1965, the cable trench was backfilled by Teer.

The new bridge and cables were accepted by the United States. The relocated canal was open to navigation at 1600 hours on December 21, 1965. Thereafter, the PRR accepted the new bridge and cables on February 21, 1967.

The General Conditions, Part I, GC–17, of the Ingalls contract required the Contracting Officer of the Corps to make a thorough examination upon the completion of the entire work, or any divisible part thereof. So far as appears from the record prior to the time when the dredge struck the cables, the United States made no attempt through the employment of its own diver to inspect the cable trench or the cables which were laid in it.

### Contract dated May 25, 1971 between the United States and American Dredging

This contract was prepared by the United States. Under it American Dredging was required to dredge a channel 446' wide to a minimum depth of 36', but was entitled to be paid for all material removed to, but not below, a depth of 38'. The contract placed no limitation on the depth to which the canal could be dredged. The contract permitted American Dredging to dredge into the side slope planes referred to in Part II, Article 6–40.j. of the Ingalls contract a distance of 6' measured horizontally. It contained no prohibition against the dredging company dredging more than 6' into the side slope, but provided a monetary penalty if it did so.

At page I–5 the dredging contract specified the location and elevation of a number of utility lines which crossed the C & D Canal.[5] The contract made no mention of the existence of the submarine cables here involved despite the fact the Corps was well aware of them.

Pursuant to the dredging contract American Dredging began dredging operations in the C & D Canal on May 29, 1971. On August 26, 1971, between 3:30 p. m. and 4:00 p. m. the cutterhead of the dredge *American* came in contact with and cut or damaged some or all of the cables.

### Plaintiff's claim against the United States and/or American Dredging based upon negligence

Plaintiff claims that the United States, acting through the Corps which was in charge of the canal project, was negligent in not only failing to obtain the information necessary to fully advise American Dredging as to the precise location of the cables but was also negligent in failing to give American Dredging all of the information which it had. This negligence, plaintiff asserts, was a proximate cause of the damage which was done to the submarine cables by American Dredging during its dredging operations. The United States has denied any negligence and has argued that

"The sole proximate cause of the accident was the dredge cutterhead cutting at an excessive depth." (p. 21 of defendant United States brief in reply to plaintiff's post-trial brief, Doc. 78).

Plaintiff also asserts that American Dredging was negligent in failing to locate the submarine cables with precision and in the manner in which it operated its dredge in proximity to a known hazard concerning which it had insufficient information. This alleged negligence of American Dredging, plaintiff claims, was a proximate cause of the submarine cable damage. American Dredging denies that it was negligent and also asserts that if it was, plaintiff was contributorily negligent.

■ Plaintiff has the burden of proving by a preponderance of the evidence that either or both of the defendants were negligent and that its and/or their

---

5. Among other things the contract specified in detail the location of a submarine gas pipe line and stated that this was 55' below mean low water across the channel.

negligence was a proximate cause of the damage which plaintiff sustained.

At the time when the dredging was begun no signs or other markings existed which showed that the submarine cables in question had been laid across the canal, and the dredging company had no knowledge that this was the case.

Boyer, the American Dredging superintendent of the dredging contract, first became aware of the submarine cables when he was advised by the Penn Central bridge tender on or about June 7 (Tr. 588) of their existence but was not told where they were located. Boyer then proceeded to the Corps' office in Chesapeake City, Maryland and on June 7 or 8, or both, he spoke concerning the location of the cables with authorized representatives of the Corps, namely, Hollis, the resident engineer for the Corps, Zakutny, Hollis'. assistant, and Lyon, who, as stated, was the construction inspector of the Corps responsible for seeing to it that the cables were placed at the right depth and location. Lyon showed Boyer a blown-up copy of a drawing, Px 26, relating to the Teer contract. This did not show the trench as it was built. (Tr. 348) It merely disclosed a "cable trench" 130′ west of the centerline of the bridge. No depth or length of the trench was shown nor was information concerning the side slopes of the channel revealed. During the interview Boyer asked how deep the cables had been laid as they crossed the channel and as they came up the channel side slopes. Lyon told Boyer that the cables were buried at a depth of 45′ at the bottom of the canal for 250′ on each side of the centerline of the 35′ channel, and were located 130′ west of the centerline of the bridge and parallel to it. (Tr. 347) Lyon said nothing to suggest that the information he gave Boyer might be inaccurate or that it was desirable for Boyer to investigate further.

At the time Lyon showed the drawing, Px 26, to Boyer, Lyon had in his office other drawings related to it and to the Teer contract. Px 25 was one. It showed the cable trench as it was built.

This drawing was not shown to Boyer. It did not show the trench to be 500′ long at a depth of 45′ as Lyon had represented to Boyer, (Tr. 349–350) but showed the depth of the trench to be 45′ for a distance in the channel of only 460′–465′ before it began to ascend the side slopes. Px 25 depicted a side slope with a 1:2 ratio with the cable buried at a depth of 10′. None of this side slope information, nor in fact the length of the trench in the channel itself, was revealed to Boyer by Lyon.

Boyer informed Greaser and Pistelli, the president and vice president of American Dredging, respectively, what he had learned from Lyon. The company made no independent investigation to determine the exact location of the cables. Neither Boyer nor anyone else to his knowledge in American Dredging approached the Penn Central in an effort to ascertain the location of the cables.

Prior to August 26, 1971, when the cables were damaged by the dredging, Lyon knew from sounding rolls taken on January 20 and 21, 1965, which he had seen, that the cable trench was in fact less than 45′ deep.

Based on the information Boyer had received from the representatives of the Corps, Boyer and Captain Luzetsky of American Dredging placed ranges on the north and south shores to indicate where the cable crossed the canal. They did this after measuring with a tape 130′ west from the centerline of the bridge.

In addition, American Dredging representatives established ranges some 4,000′ or 5,000′ from the cables which when lined up, marked the south channel limit in the area of the cables. These ranges consisted of pieces of 2 x 2 with a flag or square or diamond-shaped target on the top and were 12′ or 15′ high. (Tr. 575)

Furthermore, after having learned of the existence of the cables, Captain Luzetsky told Middleton, a dredge operator for American Dredging, that while dredging in the area of the cables he should not dredge past the ranges (chan-

nel limits), or dig to an overdepth,[6] should run the cutterhead at a reduced speed and keep a man on the A Frame.[7] (Tr. 740). Middleton passed on to Thompson these same instructions when Thompson relieved Middleton as the operator of the dredge just prior to the time when the cables were cut. (Tr. 744) When the cutterhead struck the cables, Thompson had reduced the normal speed of the cutterhead from 18–20 rpms to 5 to 6 rpms. (Tr. 678–679) Thompson failed to carry out Middleton's instruction to place a man on the A Frame. The precise point at which the cutterhead struck the cables is disputed by the parties and is discussed *infra.*

■ Plaintiff challenges the sufficiency of the dredging precautions taken by American Dredging.

On the subject of the channel ranges, plaintiff points out that these ranges were almost a mile from the cables and that the sighting to establish the southernmost limit of the channel was done by the naked eye. This plaintiff claims gave rise to a substantial probability of sighting error. Other evidence rebuts this contention. The dredge struck the cables in the first set [8] of the dredge following Thompson's relief of Middleton as dredge operator. (Tr. 663) Prior to this set, Luzetsky, the captain of the dredge, and Middleton and Thompson checked the ranges to determine the position of the dredge with respect to the south channel limit and their calculations coincided. (Tr. 663, 764; Px 113, p. 31). Under these circumstances, the ranges and the gyrocompass on the dredge were sufficiently accurate guides to the dredge operator (Tr. 677–678; Px 113, pp. 136–137, 192; Px 112, p. 210), to assure that the south channel limit was not overdredged. The dredging contract itself authorized the dredg-

ing company to dredge into the side slope up to a distance of 6′.

■ Plaintiff also argues that the dredging company was negligent when Thompson, who was operating the dredge at the time of the accident, failed to place a man on the A Frame of the dredge to assure visibly that there was no overdredging of the south slope of the channel. But this evidence does not establish negligence on the part of the dredging company in view of the precautions reasonably taken by it to confine its dredging to the channel by the use of the channel ranges which had been checked for accuracy, and also the utilization of the gyrocompass aboard the dredge. See the testimony of Luzetsky, Px 113, pp. 136–137 and Folk at Px at 112, pp. 210, 253.

No evidence was offered by plaintiff to show that the practice which the dredging company followed to avoid overdredging the south slope was not in accordance with practices followed in the dredging industry generally.

On June 9, 1971, the *American* dredged over the cables north of the centerline of the canal without incident. On July 13 and/or 14, it dredged over the submarine cables south of the centerline of the canal, again without incident. On or about August 21, 1971, the Corps advised Charles A. Folk, who had succeeded Boyer as American Dredging superintendent of the project, that there were shoals in the area over the submarine cables and that such area would have to be redredged in order to eliminate such shoals. Folk asked whether the Corps would be willing to accept any of the shoals which were shown on the shoal sheet. He was told that because of the extent of the shoaling all of the shoals would have to be redredged. (Px

---

6. In this context "overdepth" means to dig in excess of 36′. According to Thompson, the dredge operator at the time the cables were struck, he had been instructed to leave just 36′ over the cables. (Tr. 655).

7. The "A Frame" *is a walkway on the bow* of the dredge. (Px 5, Tr. 583).

8. A "set" refers to the distance a dredge moves forward each time one of its two rear "spuds" (a hollow tube which anchors itself in the canal bottom, Tr. 565–566) is raised. This distance is generally 7′–8′. (Tr. 570).

112, pp. 18–19) American Dredging complied with this direction.

On August 26, 1971, between 3:30 p. m. and 4:00 p. m., the cutterhead of the dredge *American* came in contact with and cut or damaged the cables and the bridge piers owned by plaintiff since the cables were pulled loose from the piers.

The parties are in sharp disagreement as to the position of the cutterhead when it struck the cables. Both American Dredging and the United States agree that contact occurred approximately 15′ inside the channel. Plaintiff, on the other hand, claims that the cable was first struck at a point "several feet" beyond or outside the southern edge of the channel. (p. 24—Plaintiff's opening brief after trial, Doc. 76) So far as the depth of the cutterhead is concerned, American Dredging asserts that it was operating at a depth of 35′, the United States claims that its depth was at a minimum of 41.9′, and the plaintiff argues more generally that its depth was in excess of 36′.

█ The evidence on this issue is voluminous and cannot all be reconciled. Considering the evidence in its entirety, the preponderance supports a finding that the cutterhead struck the cables inside the channel at approximately 15′ north of the south channel limit and at a depth not in excess of 40.5′.[9] Had the cables been laid at a depth of 45′ as provided in the contract between the United States and Ingalls and as Lyon had represented to Boyer, a cut of 40.5′ would not have been unreasonable.

If, however, the contact of the cutterhead and cables occurred "several feet" outside the south channel limit as plaintiff argues, the maximum depth of the cutterhead reasonably supported by the evidence would not have been in excess of 36.9′. Under this hypothesis the contact would have been made into the side slope at a horizontal distance of not more than 6′, a distance authorized by

the dredging contract, and at a vertical depth less than the 38′ for which the dredging contract entitled American Dredging to be paid. The manner in which the *American* was operated, therefore, would not have been unreasonable.

Neither under the facts as they have been found nor under the hypothesis urged by the plaintiff could the cutterhead have cut the cables if they had been laid at a depth of 45′ for 250′ on either side of the centerline of the channel as provided for in the contract between the United States and Ingalls and as represented by Lyon to Boyer. This latter representation was especially important since the dredging contract said nothing about the existence of the cables and, impliedly at least, represented that none existed.

█ When one contracts with the government it is entitled to rely upon positive statements of the government and is not obligated to make an independent investigation concerning the truth of the statements. Hollerbach v. United States, 233 U.S. 165, 172, 34 S. Ct. 553, 58 L.Ed. 898 (1914). While the cited case had to do with litigation between the government and one who contracted with it, no case has been brought to the Court's attention which requires the application of any other principle where a third party who is not a party to the contract asserts a claim based upon the alleged negligence of both the contractor and the government.

█ American Dredging fulfilled the only duty which it owed to either the plaintiff or the United States when, the dredging contract being silent as to the existence or location of the cables, it reasonably inquired of the Corps where the cables were located and thereafter dredged in a reasonably prudent manner upon the basis of the information which it received. Whatever damages the plaintiff or the United States may have sustained as a result of the damage done

---

9. The maximum depth which the United States claims of 41.9′ was measured at a point 46′ inside the channel north of the south channel limit and therefore cannot be accepted as relevant.

to the cables by American Dredging was not due to any negligence on the part of the latter. In the circumstances of this case, there is no presumption of negligence on its part, as plaintiff urges, nor does the doctrine of *res ipsa loquitur* have any relevance to plaintiff's claim that the dredging company was negligent.

After having discovered that there were submarine cables across the canal, (despite implications of the dredging contract to the contrary) American Dredging inquired of the Corps as to their location before it dredged over them. At this point the United States had the duty of providing the dredging company with full, complete and accurate information on the subject. The United States breached the duty it owed to the dredging company and to plaintiff when it provided the dredging company with erroneous information concerning the length and depth of the cable trench and failed to disclose the more accurate information which it then had in its possession concerning the cables' location. This breach of duty on the part of the United States constituted negligence and was the sole proximate cause of the damage which the plaintiff and American Dredging sustained.

The parties have stipulated that plaintiff's damages amount to $575,000 and that no prejudgment interest is to be added to this figure. Judgment in that amount will be rendered in favor of the plaintiff solely against United States, and the action of plaintiff against American Dredging will be dismissed.

### American Dredging's claim against the plaintiff and/or the United States for $8,677.18

After the accident American Dredging assisted with the temporary repairs to the submarine cables. The cost involved in supplying various equipment and employees was $8,677.18. (Px 112, pp. 55–56; ADX 1)

In a counterclaim which American Dredging filed against plaintiff it alleges that it is entitled to recover this amount based upon plaintiff's negligence. In a cross-claim which it has filed against the United States it alleges that it is entitled to recover the same amount against the United States based upon the latter's negligence. These, it must be assumed, are alternative contentions and evince no intention by American Dredging to recover the same amount of damages twice.

Earlier in this opinion, *supra*, p. 1170, it has been found that a breach of duty on the part of the United States was the sole proximate cause of the damage which the plaintiff and American Dredging sustained. For this reason the counterclaim which American Dredging has filed against the plaintiff will be dismissed and judgment will be entered on the cross-claim in favor of American Dredging against the United States in the amount of $8,677.18.

### United States' claim of indemnity against American Dredging

The United States has filed a cross-claim against American Dredging for indemnity based upon two theories: first, negligence, and second, breach of contract. So far as the alleged negligence of American Dredging is concerned, it has been previously found, *supra*, pp. 1169–1170, that the damage done to the cables by the dredging company was not due to any negligence on its part.

The relevant provisions of the contract between the United States and American Dredging are found in the General Provisions of the contract. Section 9(b) provides:

"All work under this contract shall be performed in a skillful and workmanlike manner."

The earlier finding of no negligence on the part of the dredging company implies that the work done by it was performed in a skillful and workmanlike manner in the light of the terms of the dredging contract and the information given to it by the United States.

Section 12 provides in part:

"[American Dredging] shall . . . be responsible for all damages to per-

sons or property that occur as a result of [its] fault or negligence."

Again, in view of the earlier finding of no negligence on the part of American Dredging, this contractual provision provides no basis for imposing liability upon it.

Section 42(b) provides:

"[American Dredging] will protect from damage all existing improvements or utilities at or near the site of the work, the location of which is made known to him, . . ."

Since it has been proven that the location of the cables was not accurately made known to the dredging company, the obligation imposed by § 42(b) upon the dredging company is ineffective to impose liability on it.

The cross-claim of the United States seeking indemnity from American Dredging will be dismissed.

The disposition which has been made of the case makes it unnecessary to discuss other points which have been raised by the parties.

The foregoing constitutes findings of fact and conclusions of law.