MICHIGAN WISCONSIN PIPELINE COMPANY, Plaintiff-Appellee,

v.

WILLIAMS–McWILLIAMS COMPANY, in personam, et al., Defendants-Third-Party Plaintiffs-Appellants,

v.

UNITED STATES of America, et al., Third-Party Defendants-Appellees.

No. 75–1593.

United States Court of Appeals, Fifth Circuit.

May 4, 1977.

Rehearing Denied June 1, 1977.

Brunswick G. Deutsch, Overton T. Harrington, Jr., New Orleans, La., for Williams-McWilliams Co.

Donald L. King, Edward J. Koehl, Jr., New Orleans, La., for Michigan-Wisconsin Pipeline Co.

William Kanter, Allen H. Sachsel, Michael Kimmel, Appellate Section, Civil Section, Dept. of Justice, Washington, D. C., Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., for U. S.

Edward J. Rice, Jr., New Orleans, La., for Offshore Raydist, Inc.

Before BROWN, Chief Judge, AINSWORTH, Circuit Judge, and JAMESON *, District Judge.

AINSWORTH, Circuit Judge:

This maritime cause of action arose when appellant Williams-McWilliams Company, dredging under government contract in Atchafalaya Bay, encountered and damaged a natural gas pipeline belonging to appellee

* Senior District Judge for the District of Montana, sitting by designation.

Michigan Wisconsin Pipeline Company. Michigan Wisconsin brought this suit against Williams-McWilliams seeking damages for injury to the pipeline. Williams-McWilliams contends that liability should lie with the United States for furnishing faulty specifications which failed to show the presence of the pipeline and on which Williams-McWilliams contends it relied. The District Judge after a bench trial placed the liability on Williams-McWilliams, holding that Williams-McWilliams had not performed its duty of reasonable inspection to determine whether pipelines or other obstructions lay in the path of the dredging. We affirm the District Court's judgment in favor of Michigan Wisconsin but hold that Williams-McWilliams' third party complaint against the United States should have been maintained.

Congress has provided that no structure shall be built in navigable waters "except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army." Rivers and Harbors Act of 1899 § 10, 33 U.S.C. § 403. The authority to permit construction has been delegated to Division and District Engineers. 33 C.F.R. § 209.120 et seq. This authority is exercised in an area including southern Louisiana and its coastal waters by the New Orleans District of the Army Corps of Engineers. The Permits and Statistics Branch of the New Orleans District processes applications for permission to do construction in navigable waters within its jurisdiction. It gives public notice describing prospective construction and inviting public comment or protest, issues permits for approved construction, and retains file copies of construction permits. In 1965 the Placid Oil Company applied to the Engineers for permission to construct a 20-inch natural gas pipeline extending from the Eugene Island area, offshore, inland at St. Mary Parish to Patterson, Louisiana. After routine processing the application was approved and the pipeline was constructed.

Copies of permits for construction projects such as the Placid Oil pipeline are filed at the Permit Section of the Engi-

neers' New Orleans offices. The public may consult the files to learn of the existence and location of submarine structures. The permits are filed according to waterway names; most permits involve only one waterway and are filed under that name. Some permits, however, often including those concerning pipelines, involve several waterways. According to the testimony of Charles W. Decker, Chief of the Permits and Statistics Branch of the New Orleans District, it was the policy of the Engineers at all times material to this case to discourage filing applications for separate permits for each waterway crossed by such a structure. Instead the Engineers encouraged applicants to include all navigable waterway crossings by a proposed pipeline in one application. A single permit for all crossings was issued and filed under the name of one major waterway crossed by the pipeline. This was done in the case of the Placid Oil 20-inch line. Although the Permit Section's file on that line indicates that it crosses at least twelve waterways, a single permit was issued for all of them. That permit was filed under the heading "LTAV"—LT for the Louisiana-Texas section of the Intracoastal Waterway, and AV for the portion of the Waterway between the Atchafalaya and Vermillion Rivers. Only this single copy of the permit was filed by the Engineers. At the material times, according to Decker, no cross-reference index of the copies of the permits was maintained by the Permit Section as to any other waterway.

Decker testified that one waterway crossed by the Placid line was not clearly shown on the application drawings and was not listed among the waterways to be crossed in the public notice of proposed construction. This was the Atchafalaya Fairway, containing the Atchafalaya River channel, which extends into Atchafalaya Bay to the south of St. Mary Parish. Decker's testimony discloses that nothing either in the 20-inch pipeline's permit file or in the public notice explicitly indicates that the pipeline crossed the channel. This omission was particularly misleading, as Decker stated in his testimony, due to the distance

between the Intracoastal Waterway and the Atchafalaya Fairway in the Bay. Decker testified that someone familiar with the Permit Section's single permit filing system who found no permits under a particular heading might cross-check for permits under the headings of nearby waterways, but that in the case of waterways as far apart as the Intracoastal Waterway and the Atchafalaya Fairway such cross-checking was unlikely.

In 1967 the 20-inch pipeline was transferred from Placid Oil Company to the Michigan Wisconsin Pipeline Company. Soon afterward Michigan Wisconsin applied for a permit to construct a 30-inch natural gas pipeline parallel to the 20-inch line already in place. The public notice which was issued concerning the 30-inch pipeline did contain a reference to the Atchafalaya Fairway; however, no new permit was issued for the 30-inch line. Instead the existing permit for the 20-inch line was amended to include the 30-inch line. No other filing concerning the new 30-inch line was made at the Permit Section.

The Permit Section received a "completion letter" giving notice of completion of the 30-inch line on May 7, 1971. It was the practice of the Permit Section after such construction had been completed to wait until the construction had been inspected and then to forward the completion notice to the Engineering Division. The Engineering Division includes the Service Branch, and is the Division in which specifications drawings are prepared for construction projects let by the Engineers. When the Service Branch receives such completion notices its employees chart the new construction on "base maps" which are employed when specifications drawings are made up. At the time of the accident giving rise to this case the completion letter for the 30-inch Michigan Wisconsin pipeline was still in the hands of the inspector. The Survey Section did not receive the letter until October 18, 1971. Therefore, construction of the additional pipeline was not yet shown on the base maps at the time of the accident.

In 1971 the New Orleans District of the Corps of Engineers, the same District at whose offices the Michigan Wisconsin pipeline construction permit was on file, determined to let a contract for the biyearly maintenance dredging of the Atchafalaya River channel in Atchafalaya Bay. The Engineers prepared specifications and distributed them to prospective bidders. Included among the specification documents was a drawing of the area to be dredged. This was prepared by George Meyn, an employee of the Waterways Section of the New Orleans office of the Engineers. Meyn testified that he visited the Permit Section to see whether the Permit Section files contained any permits for construction crossing the channel to be dredged. He testified that he told the Permit Section employees that he wished "to see all of the permits on the project" and that they showed him the file headed "Atchafalaya River—Morgan City to the Gulf." Because Meyn was familiar with the Permit Section files he received no further assistance from Permit Section employees. He testified that he spent "two to three hours" examining the files and found no pipeline construction permits therein. Obviously the reason Meyn did not find the permit involved here was that it had been filed by the Engineers under an Intracoastal Waterway heading (LTAV) rather than an Atchafalaya River heading. Accordingly, the drawing which he prepared and included in the specifications did not show the Michigan Wisconsin pipelines which lay across the Atchafalaya River channel.

Williams-McWilliams submitted the low bid and was awarded the contract, number DACW 29–71–C–0246, to dredge the channel. Attached to the contract and made a part thereof was a copy of the specifications prepared by the Engineers, including the drawing prepared by Meyn.

The dredging contract provided in part that Williams-McWilliams was to position its dredge in the channel by electronic means. Offshore Raydist, Inc. was engaged by Williams-McWilliams to provide the electronic positioning.

The contract also contained two "site inspection" clauses placing upon the contractor the responsibility "for having taken steps reasonably necessary to ascertain the nature and location of the work and the general and local conditions which can affect the work and the cost thereof" and requiring the contractor to acknowledge that he "has investigated and satisfied himself as to the conditions affecting the work. . . . "[1] Costs occasioned by the contractor's failure to inspect the site were to be borne by the contractor. The record shows that a Williams-McWilliams engineer, accompanied by two Corps of Engineers field engineers and an Offshore Raydist technician, made a site inspection using a fathometer which revealed no structures or other impediments to dredging on the bottom of the channel. This conformed with Williams-McWilliams' experience of two years earlier, when the company dredged the same channel without mishap.

Williams-McWilliams began dredging on July 12, 1971, using the dredge Arkansas.

The Arkansas was positioned by Offshore Raydist, as provided by the contract. The District Judge found that Offshore "apparently" misinterpreted its half-scale chart, and as a result positioned the Arkansas 250 feet too far to the west. When the Arkansas began dredging she was dredging on a line 250 feet away from, and parallel to, the intended dredge line.

The Arkansas is not self-propelled. She advances during dredging with the help of 38-inch diameter metal poles, or spuds, which are driven into the river bottom. On July 13 the Arkansas' port spud encountered what proved to be the Michigan Wisconsin 30-inch natural gas pipeline. The line was ruptured[2] and loss incurred by Michigan Wisconsin.

On October 7, 1971, Michigan Wisconsin filed this suit in the admiralty jurisdiction of the federal district court seeking damages estimated at $700,000 against Williams-McWilliams for alleged negligence in its dredging operations resulting in the injury to Michigan Wisconsin's pipeline.

1. The text of the inspection clauses follows:

 13. CONDITIONS AFFECTING THE WORK (1964 JUN)

 The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local conditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Government. The Government assumes no responsibility for any understanding or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations by the Government are expressly stated in the contract. (ASPR 7–602.14)

 . . . . . .

 41. SITE INVESTIGATION (1965 JAN)

 The Contractor acknowledges that he has investigated and satisfied himself as to the conditions affecting the work, including but not restricted to those bearing upon transportation, disposal, handling and storage of materials, availability of labor, water, electric power, roads and uncertainties of weather, river stages, tides or similar physical conditions at the site, the conformation and conditions of the ground, the character of equipment and facilities needed preliminary to and during prosecution of the work. The Contractor further acknowledges that he has satisfied himself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered insofar as the information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the Government, as well as from information presented by the drawings and specifications made a part of this contract. Any failure by the Contractor to acquaint himself with the available information will not relieve him from responsibility for estimating properly the difficulty or cost of successfully performing the work. The Government assumes no responsibility for any conclusions or interpretations made by the Contractor on the basis of the information made available by the Government. (ASPR 7–602.33)

2. Marine surveyor reports indicate that the pipeline's "concrete and protective outer layer in an area approximately 6″ to 8″ of the concrete, and an area approximately 2″ to 3″ of the pipeline itself was found holed." The concrete coating was approximately 5 inches thick, according to the record. About 18 feet of the pipeline was replaced.

On August 7, 1972, Williams-McWilliams filed its third party complaint against the United States and against Offshore Raydist. Williams alleged that the Government through the Engineers was at fault in providing specifications and drawings for the dredging contract which failed to show the presence and location of the 30-inch pipeline and the parallel 20-inch line. Williams-McWilliams also alleged that Offshore Raydist was liable for mispositioning the Arkansas prior to the commencement of dredging.

On September 17, 1973, Offshore Raydist filed a cross claim against third party defendant, the United States, asserting that any loss or damage sustained by Michigan Wisconsin or by Williams-McWilliams was due to the failure of the United States

> to properly index and file an application for pipeline permit and/or in failing to properly research the records of the Corps of Engineers to determine the location of the pipeline allegedly damaged, and/or in failing to provide sufficient charts and/or maps indicating the location of the pipeline in question, and/or in failing to properly compute and/or chart the location of where the dredging work was to be performed in the Atchafalaya Bay, and/or in failing to properly chart or map the location of the dredging work to be performed in the Atchafalaya Bay.

The cause was tried to the District Judge without a jury beginning October 1, 1973. The District Judge made extensive findings of fact and conclusions of law. Most significant for present purposes is the finding that the Engineers made no express representation concerning the location of pipelines to Williams-McWilliams, and the Court's conclusion that Williams-McWilliams therefore had a duty to inquire as to the presence of pipelines or other obstructions which Williams-McWilliams failed to perform. The trial judge found that Williams-McWilliams' negligence in breaching this duty "was a proximate cause of the accident and consequent damage." Accord-

ingly, the trial judge entered judgment against Williams-McWilliams "in personam" and against the Arkansas "in rem" for the entire amount of the damage to Michigan Wisconsin [3] and exonerated the United States and Offshore.

Williams-McWilliams brings this appeal from the judgment of the trial court. Williams-McWilliams argues that it was not negligent, but that it justifiably relied upon the Engineers' specifications drawing showing no pipelines in the area to be dredged. Williams-McWilliams contends that Michigan Wisconsin was itself negligent because its pipeline lay slightly to one side of the route permitted to it; that it failed to mark or warn of the pipeline's presence; and that it placed the pipeline in a fairway in violation of published government regulations. Williams-McWilliams further argues that Offshore Raydist was at fault because it initially mispositioned the Arkansas by 250 feet. Finally Williams-McWilliams urges that the Government was at fault for its failure to include the location of the pipelines on its specifications drawings.

In this unusual case a contractor seeks to impute liability to the Government where a third party was injured by actions of the contractor allegedly taken in reliance on government specifications. We must decide whether the contractor was justified in relying on the specifications without further investigation.

■ As a general rule contractors may recover excess costs from the Government when the costs were incurred as a result of reliance upon a "positive assertion" or "representation" made by the Government, and in such event the contractor is not required to investigate the accuracy of the government representation in such cases. *Hollerbach v. United States*, 233 U.S. 165, 172, 34 S.Ct. 553, 556, 58 L.Ed. 898 (1914). A threshold question in this case is whether the *Hollerbach* principle applies when the contractor seeks not to recover excess costs under the contract but to impute liability to

---

**3.** The amount of damages is to be decided in a later action if necessary. The action being re-

viewed was to determine the issue of liability only.

the Government for damage by the contractor to a third party. One court has recently ruled that the *Hollerbach* rule does apply in such circumstances:

> While the case cited [*Hollerbach*] had to do with litigation between the government and one who contracted with it, no case has been brought to the Court's attention which requires the application of any other principle where a third party who is not a party to the contract asserts a claim based upon the alleged negligence of both the contractor and the government.

*Penn Central Transportation Co. v. United States*, D.Del., 1973, 366 F.Supp. 1161, 1169, *aff'd*, 3 Cir., 1974, 505 F.2d 730. We agree that when a contractor has justifiably relied upon government representations he should be protected from claims by third parties just as he would be protected from additional costs for materials or labor. The general law on the subject recognizes that

> the contractor is not liable if he has merely carried out carefully the plans, specifications and directions given him, since in that case the responsibility is assumed by the employer, at least where the plans are not so obviously defective and dangerous that no reasonable man would follow them.

W. Prosser, Handbook of the Law of Torts § 99, at 695 (3d ed. 1964); *see also id.* § 70, at 482. Accordingly, if the Engineers made a representation to Williams-McWilliams on which the latter was justified in relying, and if that representation was the proximate cause of the injury to Michigan Wisconsin, then the Government must bear the liability.

But the Government argues that the Engineers' drawing in the specifications made no express representation to Williams-McWilliams and did not address the presence of pipelines; therefore, that the contractor was not justified, without further investigation, in relying on the drawing's failure to depict pipelines.

 Thus we address the question of what would constitute a "positive assertion" or a "representation" upon which a claimant could justifiably rely in this context. By a prolonged course of conduct the Government can induce justifiable reliance by interested parties on the course of action being continued. *Indian Towing co. v. United States*, 350 U.S. 61, 69, 76 S.Ct. 122, 126–27, 100 L.Ed. 48 (1955); *Canadian Pacific (Bermuda) Ltd. v. United States*, 5 Cir., 1976, 534 F.2d 1165, 1169. Similarly the Government may by a prolonged course of conduct lead a contractor to expect that when certain kinds of material structures are present in an area in which a contract is to be performed that the structures will be shown on the specifications drawings. The contractor may then rely on the Government continuing to depict those kinds of structures when they are present. In such circumstances not to show those kinds of structures on specifications drawings conveys to the contractor the information that such structures are not present. Thus the absence of depiction is just as much an item of information upon which the contractor may rely as depiction would be, given a prolonged course of conduct justifying contractor reliance on the Government providing this information one way or the other in specifications drawings.[4]

In the present case Williams-McWilliams' field engineer, Raymond Champagne, testified that in his experience

> it is customary, whenever we have to dredge over utility crossings, that the Corps will have it shown on the plan map, and also in their plans and specifications,

---

4. In *Hollerbach* the Supreme Court said that the Government "might easily have omitted the specification" on which the contractor relied and thereby have avoided liability because the contractor would have been left to make its own investigation. The specification involved the nature of backfill of a dam. To omit a description of the backfill would not amount to a representation that no backfill was present because the dam necessarily had backfill; similarly it would not amount to a representation that a certain kind of backfill was present. In other words, it is only in certain cases, such as a map, in which a blank necessarily has a known meaning, that absence of a description would amount to a representation.

listing the station number, and the depth of the crossing.

. . . . .

Any time a Corps of Engineers channel or channels are being dredged by the Corps of Engineers, if there is a pipe line marker on—I mean a pipe line crossing, across the channel, it will be on the plans, yes.

Carl B. Hakenjos, Williams-McWilliams' vice president for dredging, testified:

On other contracts they [pipelines] are mentioned where they are present.

. . . . .

The fact that they were not mentioned led us to believe that they were not there.

George Meyn, an Engineers' employee for 44 years prior to his retirement in 1972, whose duties included the preparation of specifications drawings, testified that "we have to delineate upon the map any obstructions," and that "there is a list of things that you are supposed to have, you know what I mean, to look for, to check for. And pipe lines is one of them, one of the things to check for." Meyn continued:

As long as I have been writing specifications for dredging, we have always, it has always been a practice to show pipe lines and other obstructions in the channel to be dredged.

. . . . .

As I said before, it was a requirement, as far as I remember, in the last say eight to ten years, there was a list of things to do, to show on the specifications and drawings.

Joseph Maes, another Engineers' employee engaged in preparing specifications drawings, was asked, "Do you as a matter of regular practice include any pipe lines or utility crossing areas to be in the plans and specifications?" Maes answered, "I did when it was known." Of course the Michigan Wisconsin pipeline was "known" to the Engineers because the construction permit issued by the Engineers to cross navigable waters, including Atchafalaya Bay, was on file in the Permit Section of the New Orleans office of the Engineers where it had been issued.

It is clear that in the present case the Engineers intended to continue their usual practice of depicting pipelines and other obstructions on the specifications drawing. The testimony of Meyn, who prepared the chart, shows that he intended to make a representation on the drawing concerning the presence or absence of pipelines in the area to be dredged. He spent "two to three" hours searching the Permit Section files for indications of pipelines even though he had made the same search "four or five" times in the past and had found nothing. Following his unsuccessful search of the Permit Section files Meyn prepared the drawing in a manner intended to convey the information that no pipeline or other structure was present in the portion of the Atchafalaya River channel to be dredged.

The chart which Meyn prepared and on which Williams-McWilliams relied gives every indication of having been prepared with care, and checked and rechecked. The signatures or initials of seven Engineers officials appear on the drawing, including the signature of the District Engineer. The drawing, along with the other specifications, is made a part of the dredging contract, and the contract requires the drawing to be kept on board the dredge at all times.

■ These circumstances lead us to the conclusion that the Engineers regularly depict pipelines on dredging specifications drawings, and that they failed to do so in this case through mistake.[5] Williams-

---

5. Negligence need not be shown for the Engineers' mistake to raise liability. As the Court of Claims has said,

[D]efendant [the United States] warrants the adequacy of its plans and specifications. If they are defective, defendant is at fault. It is irrelevant whether defendant was or was not negligent in the preparation of them.

*Carl M. Halvorson, Inc. v. United States*, 1972, 461 F.2d 1337, 1345, 198 Ct.Cl. 882.

Nevertheless there are indications in the record that the omission of the pipeline from the dredging specifications was the result of faulty government procedures. As noted in the recital of facts above, information concerning the 30-inch pipeline failed to be included on the

McWilliams was justified in relying on the Engineers' prior practice of depicting pipelines. Thus the failure of the drawing in this case to depict pipelines across Atchafalaya Bay in the area being dredged amounted to a representation or "positive assertion" of their absence. To say that to fail to include the pipelines on the drawing was to make no representation either way concerning their presence would be to excuse the mistake by its very nature, and this we decline to do. We conclude that a representation was made. As noted before, government contractors are entitled to rely upon positive statements of the Government and are not obligated to make an independent investigation into their accuracy. *Hollerbach v. United States, supra,* 233 U.S. at 172, 34 S.Ct. at 556.

The District Judge found as a fact that the "specifications did not affirmatively state that no such pipeline existed and made no representation that no such obstructions or pipelines existed." Whether the specifications drawing made any "representation" concerning the presence of pipelines is a fundamental issue in this case which we treat as an issue of law. In drawing his conclusion that no representations were made the District Judge overlooked much of the evidence which we have discussed. In light of that evidence, and particularly of the testimony of George Meyn which we have quoted, we hold that the conclusion that no representation was made is insupportable and must be set aside. *See Solomon v. Warren,* 5 Cir., 1976, 540 F.2d 777, 784.

The District Judge concluded as a matter of law that "[t]he contract involved in this suit specifically disavowed positive information as to the nature and local conditions of the vicinity to be dredged. There was then a duty on Williams-McWilliams to Michigan Wisconsin to inquire of the Corps where pipelines were located . . .." The contract language referred to by the District Judge lies in the two caveatory site inspection clauses quoted in the margin above. The District Judge's conclusions concerning the effect of these clauses misconstrues the relationship between caveatory or exculpatory clauses in government contracts and government representations:

> Caveatory and exculpatory contractual provisions will not shift the liability flowing from an express or implied representation made by the Government and reasonably relied upon by the contractor.

*Maurice Mandel, Inc. v. United States,* 8 Cir., 1970, 424 F.2d 1252, 1255–56. To the same effect is *Mountain Home Contractors v. United States,* 1970, 425 F.2d 1260, 192 Ct.Cl. 16, in which the Court of Claims held that by means of a caveatory clause "[t]he government cannot make a contractor the insurer of all government mistakes." *Mountain Home Contractors v. United States, supra,* 425 F.2d at 1264. *See Hollerbach v. United States, supra,* 233 U.S. at 172, 34 S.Ct. at 556. Accordingly, the District Judge's conclusion that the contractor was bound by these caveatory clauses was clearly erroneous and must be set aside.

■ The District Judge concluded that the Michigan Wisconsin pipeline was constructed in accordance with applicable regulations and with the terms of its permit; that Michigan Wisconsin was not in violation of regulations concerning the marking of structures and obstructions in navigable waterways; and that the pipeline's 35-foot deviation from the route permitted to it was not a proximate cause of the damage to the pipeline. Therefore, the District Judge held Michigan Wisconsin faultless and entered a judgment in its favor. We agree and affirm.

Engineering Division's base maps for six months after the Permit Section received notice of completion. This lapse is discussed in a brief report by the Chief, Engineering Division to the District Engineer, explaining why the pipeline did not appear on the dredging specifications. Of course, the fact that such a report was required at all is further indication that it was the policy and intent of the Engineers to include information concerning the presence or absence of pipelines on specifications drawings. In the same report reference is made to the "inadequacy of the [Permit Branch] filing system." It thus appears that the Engineers themselves recognize that their own shortcomings resulted in omission of information which it was their policy to include on specifications drawings.

**954**

The District Judge found that Offshore Raydist's error in positioning the dredge Arkansas was not a proximate cause of the damage to the pipeline, and dismissed Williams-McWilliams' third party claim against Offshore. We affirm the dismissal.

However, having found herein that the Government is liable for its error in promulgating the specifications on which the contractor Williams-McWilliams justifiably relied, Williams-McWilliams' third party claim is maintained against the United States as the party solely at fault, and the District Court's decision which dismissed the third party complaint is reversed, with directions to enter a judgment against the United States.

AFFIRMED IN PART; REVERSED IN PART.