# HERCULES, INC. ET AL. *v.* UNITED STATES

No. 94–818.   Argued October 30, 1995—Decided March 4, 1996

418

REHNQUIST, C. J., delivered the opinion of the Court, in which SCALIA, KENNEDY, SOUTER, THOMAS, and GINSBURG, JJ., joined. BREYER, J., filed a dissenting opinion, in which O'CONNOR, J., joined, *post*, p. 431. STEVENS, J., took no part in the consideration or decision of the case.

*Carter G. Phillips* argued the cause for petitioners. With him on the briefs were *James S. Turner, Alan Dumoff, Jerold Oshinsky, Gregory W. Homer, Rhonda D. Orin,* and *Walter S. Rowland.*

*Edward C. DuMont* argued the cause for the United States. With him on the brief were *Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor Gen-*

*eral Bender, David S. Fishback, Alfred Mollin*, and *Michael T. McCaul.* *

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Petitioners in this case incurred substantial costs defending, and then settling, third-party tort claims arising out of their performance of Government contracts. In this action under the Tucker Act, they sought to recover these costs from the Government on alternative theories of contractual indemnification or warranty of specifications provided by the Government. We hold that they may not do so.

When the United States had armed forces stationed in Southeast Asia in the 1960's, it asked several chemical manufacturers, including petitioners Hercules Incorporated (Hercules) and Wm. T. Thompson Company (Thompson), to manufacture and sell it a specific phenoxy herbicide, code-named Agent Orange. The Department of Defense wanted to spray the defoliant in high concentrations on tree and plant life in order to both eliminate the enemy's hiding places and destroy its food supplies. From 1964 to 1968, the Government, pursuant to the Defense Production Act of 1950 (DPA), 64 Stat. 798, as amended, 50 U. S. C. App. § 2061 *et seq.* (1988 ed. and Supp. V), entered into a series of fixed-price production contracts with petitioners. The military prescribed the formula and detailed specifications for manufacture. The contracts also instructed the suppliers to mark the drums containing the herbicide with a 3-inch orange band with "[n]o

*Herbert L. Fenster, Ray M. Aragon,* and *Robin S. Conrad* filed a brief for the Chamber of Commerce of the United States of America as *amicus curiae* urging reversal.

*Robert M. Hager* filed a brief for the Agent Orange Coordinating Council as *amicus curiae* urging affirmance.

*Gershon M. Ratner* filed a brief for the National Veterans Legal Services Program as *amicus curiae.*

further identification as to conten[t]." Lodging 30 (available in clerk's office case file). Petitioners fully complied.

In the late 1970's, Vietnam veterans and their families began filing lawsuits against nine manufacturers of Agent Orange, including petitioners. The plaintiffs alleged that the veterans' exposure to dioxin, a toxic byproduct found in Agent Orange and believed by many to be hazardous, had caused various health problems. The lawsuits were consolidated in the Eastern District of New York and a class action was certified. *In re "Agent Orange" Product Liability Litigation*, 506 F. Supp. 762, 787–792 (1980).

District Judge Pratt awarded petitioners summary judgment on the basis of the Government contractor defense in May 1983. *In re "Agent Orange" Product Liability Litigation*, 565 F. Supp. 1263. Before the judgment was entered, however, the case was transferred to Chief Judge Weinstein, who withdrew Judge Pratt's opinion, ruled that the viability of the Government contractor defense could not be determined before trial, and reinstated petitioners as defendants. See *In re "Agent Orange" Product Liability Litigation*, 597 F. Supp. 740, 753 (1984).

In May 1984, hours before the start of trial, the parties settled. The defendants agreed to create a $180 million settlement fund with each manufacturer contributing on a market-share basis. Hercules' share was $18,772,568; Thompson's was $3,096,597. Petitioners also incurred costs defending these suits exceeding $9 million combined.[1]

---

[1] Nearly 300 plaintiffs decided to "opt out" of the certified class and to proceed with their claims independent of the class action. After the class action settled, the defendant manufacturers sought and received summary judgment against these plaintiffs. The District Court found that the opt-out plaintiffs failed to present credible evidence of a causal connection between the veterans' exposure to Agent Orange and their alleged injuries and that the Government contractor defense barred liability. *In re "Agent Orange" Product Liability Litigation*, 611 F. Supp. 1223 (1985). The Court of Appeals for the Second Circuit affirmed, but solely on the basis of the Government contractor defense. *In re "Agent Orange"*

Petitioners want the United States to reimburse them for the costs of defending and settling this litigation. They attempted to recover first in District Court under tort theories of contribution and noncontractual indemnification. Having failed there,[2] they each sued the Government in the United States Claims Court, invoking jurisdiction under 28 U. S. C. § 1491, and raising various claims sounding in contract.[3] On the Government's motions, the Claims Court granted summary judgment against petitioners and dismissed both complaints. *Hercules, Inc.* v. *United States,* 25 Cl. Ct. 616 (1992); *Wm. T. Thompson Co.* v. *United States,* 26 Cl. Ct. 17 (1992).

The two cases were consolidated for appeal and a divided panel of the Court of Appeals for the Federal Circuit affirmed. 24 F. 3d 188 (1994). The court held that petitioners' claim of implied warranty of specifications failed because petitioners could not prove causation between the alleged breach and the damages. The court explained that, had petitioners pursued the class-action litigation to completion, the Government contractor defense would have barred the imposition of tort liability against them. The Government contractor defense, which many courts recognized before the *Agent Orange* settlement, but which this Court did not con-

---

*Product Liability Litigation,* 818 F. 2d 187, 189 (1987), cert. denied *sub nom. Krupkin* v. *Dow Chemical Co.,* 487 U. S. 1234 (1988).

[2] The District Court dismissed the claims, *In re "Agent Orange" Product Liability Litigation, supra,* and the Second Circuit affirmed. The appeals court found first that *Stencel Aero Engineering Corp.* v. *United States,* 431 U. S. 666 (1977), precluded such recovery and second that "well-established principles of tort law" would not recognize contribution and indemnity where the underlying claims that settled "were without merit." *In re "Agent Orange" Product Liability Litigation, supra,* at 207.

[3] Thompson also raised in its amended complaint a claim under the Takings Clause of the Fifth Amendment, but subsequently abandoned that claim while still in the Claims Court. *Wm. T. Thompson Co.* v. *United States,* 26 Cl. Ct. 17, 22, n. 6 (1992).

sider until afterward, shields contractors from tort liability for products manufactured for the Government in accordance with Government specifications, if the contractor warned the United States about any hazards known to the contractor but not to the Government. *Boyle* v. *United Technologies Corp.*, 487 U. S. 500, 512 (1988). Because the Court of Appeals believed petitioners could have availed themselves of this defense, the court held that, by settling, petitioners voluntarily assumed liability for which the Government was not responsible. It also rejected Thompson's claim of contractual indemnification. Thompson had argued that the Government, pursuant to § 707 of the DPA, 50 U. S. C. App. § 2157 (1988 ed.), impliedly promised to indemnify Thompson for any liabilities incurred in performing under the DPA. Not persuaded, the court held that § 707 did not create indemnification, but only provided a defense to a suit brought against the contractor by a disgruntled customer whose work order the DPA contract displaced. We granted certiorari, 514 U. S. 1049 (1995), and now affirm the judgment below but on different grounds.[4]

We begin by noting the limits of federal jurisdiction. "[T]he United States, as sovereign, 'is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *United States* v. *Testan*, 424 U. S. 392, 399 (1976), quoting *United States* v. *Sherwood*, 312 U. S. 584, 586

---

[4] JUSTICE BREYER's dissent does not distinguish between, or separately address, the warranty-of-specifications and contractual-indemnification claims. The dissent further observes that petitioners "also set forth" a third "much more general fact-based claim." *Post*, at 436. This third claim, we believe, is indistinguishable from the contractual-indemnification claim that Thompson (but not Hercules) has raised, and which we address. To the extent that it differs from a claim for contractual indemnification, we decline to consider it; such a claim was neither presented to the Court of Appeals nor argued in the briefs to this Court.

(1941). Congress created the Claims Court[5] to permit "a special and limited class of cases" to proceed against the United States, *Tennessee* v. *Sneed*, 96 U. S. 69, 75 (1878), and the court "can take cognizance only of those [claims] which by the terms of some act of Congress are committed to it," *Thurston* v. *United States*, 232 U. S. 469, 476 (1914); *United States* v. *Sherwood, supra,* at 586–589. The Tucker Act confers upon the court jurisdiction to hear and determine, *inter alia,* claims against the United States founded upon any "express or implied" contract with the United States. 28 U. S. C. § 1491(a).

We have repeatedly held that this jurisdiction extends only to contracts either express or implied in fact, and not to claims on contracts implied in law. *Sutton* v. *United States*, 256 U. S. 575, 581 (1921); *Merritt* v. *United States*, 267 U. S. 338, 341 (1925); *United States* v. *Minnesota Mut. Investment Co.*, 271 U. S. 212, 217 (1926); *United States* v. *Mitchell*, 463 U. S. 206, 218 (1983). Each material term or contractual obligation, as well as the contract as a whole, is subject to this jurisdictional limitation. See, *e. g., Sutton, supra,* at 580–581 (refusing to recognize an implied agreement to pay the fair value of work performed because the term was not "express or implied in fact" in the Government contract for dredging services); *Lopez* v. *A. C. & S., Inc.*, 858 F. 2d 712, 714–715, 716 (CA Fed. 1988) (a *Spearin* warranty within an asbestos contract must be implied in fact).

The distinction between "implied in fact" and "implied in law," and the consequent limitation, is well established in

---

[5] Under the Federal Courts Improvement Act of 1982, the newly created Claims Court inherited substantially all of the trial court jurisdiction of the Court of Claims. 96 Stat. 25. In 1992, Congress changed the title of the Claims Court and it is now the United States Court of Federal Claims. Federal Courts Administration Act of 1992, 106 Stat. 4506. Because the most recent change went into effect after that court rendered its decision in this case, we shall refer to it as the Claims Court throughout this opinion.

our cases. An agreement implied in fact is "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R. Co.* v. *United States*, 261 U. S. 592, 597 (1923). See also *Russell* v. *United States*, 182 U. S. 516, 530 (1901) ("[T]o give the Court of Claims jurisdiction the demand sued on must be founded on a convention between the parties—'a coming together of minds'"). By contrast, an agreement implied in law is a "fiction of law" where "a promise is imputed to perform a legal duty, as to repay money obtained by fraud or duress." *Baltimore & Ohio R. Co., supra*, at 597.

Petitioners do not contend that their contracts contain express warranty or indemnification provisions. Therefore, for them to prevail, they must establish that, based on the circumstances at the time of contracting, there was an implied agreement between the parties to provide the undertakings that petitioners allege. We consider petitioners' warranty-of-specifications and contractual-indemnification claims in turn.

The seminal case recognizing a cause of action for breach of contractual warranty of specifications is *United States* v. *Spearin*, 248 U. S. 132 (1918). In that case, Spearin had contracted to build a dry dock in accordance with the Government's plans which called for the relocation of a storm sewer. After Spearin had moved the sewer, but before he had completed the dry dock, the sewer broke and caused the site to flood. The United States refused to pay for the damages and annulled the contract. Spearin filed suit to recover the balance due on his work and lost profits. This Court held that "if the contractor is bound to build according to plans and specifications prepared by [the Government], the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.*, at 136. From this, petitioners contend the United States is responsible for

costs incurred in defending and settling the third-party tort claims.

Neither the warranty nor *Spearin* extends that far. When the Government provides specifications directing how a contract is to be performed, the Government warrants that the contractor will be able to perform the contract satisfactorily if it follows the specifications. The specifications will not frustrate performance or make it impossible. It is quite logical to infer from the circumstance of one party providing specifications for performance that that party warrants the capability of performance. But this circumstance alone does not support a further inference that would extend the warranty beyond performance to third-party claims against the contractor. In this case, for example, it would be strange to conclude that the United States, understanding the herbicide's military use, actually contemplated a warranty that would extend to sums a manufacturer paid to a third party to settle claims such as are involved in the present action. It seems more likely that the Government would avoid such an obligation, because reimbursement through contract would provide a contractor with what is denied to it through tort law. See *Stencel Aero Engineering Corp.* v. *United States,* 431 U. S. 666 (1977).[6]

---

[6] JUSTICE BREYER asserts, *post,* at 440, that "the majority . . . impl[ies] that a 1960's contracting officer would not have accepted an indemnification provision because of *Stencel Aero Engineering Corp.* v. *United States,* 431 U. S. 666 (1977)." The case is cited not for such an implication, but to provide added support for our decision not to extend the warranty-of-specification claim beyond performance. Although we decided *Stencel* after the formation of the Agent Orange contracts, we observed in that opinion that the Court of Appeals for the Ninth Circuit in 1964 had adopted the position we would hold in *Stencel,* and that decisions inconsistent with that view began to arise in the Circuits only in 1972. *Stencel,* 431 U. S., at 669, n. 6 (citing *United Air Lines, Inc.* v. *Wiener,* 335 F. 2d 379, 404 (CA9 1964), and *Barr* v. *Brezina Constr. Co.,* 464 F. 2d 1141, 1143–1144 (CA10 1972)). Therefore, when the contracts at issue were drafted, *Wiener* at the very least suggested that the Government would not be liable under a tort theory.

As an alternative basis for recovery, Thompson contends that the context in which the Government compelled it to manufacture Agent Orange constitutes an implied-in-fact agreement by the Government to indemnify for losses to third parties.[7] The Government required Thompson to produce under authority of the DPA and threat of civil and criminal fines, imposed detailed specifications, had superior knowledge of the hazards, and, to a measurable extent, seized Thompson's processing facilities. Under these conditions, petitioner contends, the contract must be read to include an implied agreement to protect the contractor and indemnify its losses. We cannot agree.

The circumstances surrounding the contracting are only relevant to the extent that they help us deduce what the parties to the contract agreed to in fact. These conditions here do not, we think, give rise to an implied-in-fact indemnity agreement.[8] There is also reason to think that a con-

---

[7] Hercules did not plead contractual indemnification in its complaint or raise the claim in the Court of Appeals. Indeed, in the Claims Court, Hercules expressly disavowed having raised any contractual-indemnification claim. Plaintiff's Memorandum in Opposition to Defendant's Motion to Dismiss and for Summary Judgment in No. 90–496, p. 55 ("Hercules' claims for relief all are based on breaches of contractual duties; they are not claims that the Government has impliedly or expressly agreed to indemnify Hercules for open-ended liabilities").

[8] JUSTICE BREYER argues that the record before us does not permit us to find, as we do, that the conditions asserted do not support the inference that the contracting parties had a meeting of the minds and in fact agreed that the United States would indemnify. If JUSTICE BREYER is suggesting that the petitioners need further discovery to develop claims alleged in the complaints and not to some unarticulated third claim, see n. 4, supra; post, at 436), we believe his plea for further discovery must necessarily apply only to Thompson's contractual-indemnification claim; we hold in this case that the Spearin claims made by both petitioners do not extend to postperformance third-party costs as a matter of law. See supra, at 425. In any event, JUSTICE BREYER fails to explain what facts are needed, or might be developed, which would place a court on remand in a better position than where we sit today. We take all factual allegations

tracting officer would not agree to the open-ended indemnification alleged here. The Anti-Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation. 31 U. S. C. § 1341.[9] Ordinarily no federal appropriation covers contractors' payments to third-party tort claimants in these circumstances, and the Comptroller General has repeatedly ruled that Government procurement agencies may not enter into the type of open-ended indemnity for third-party liability that petitioner Thompson claims to have implicitly received under the Agent Orange contracts.[10] We view the Anti-Deficiency Act, and the contract-

as true and still find them inadequate. In addition, we are skeptical that any material information regarding these 30-year-old transactions remains undisclosed, yet still discoverable. Hercules, and presumably Thompson, had access to all discovery materials (including thousands of documents and scores of depositions) produced during the *Agent Orange* class-action litigation. See Motion of United States for a Protective Order Staying Discovery in No. 90–496 (Cl. Ct.), pp. 1, 3–4, n. 1.

[9] The Anti-Deficiency Act, 31 U. S. C. § 1341, provides:

"(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—

"(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation;

"(B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."

[10] With one peculiar exception that the Comptroller General expressly sanctioned, "the accounting officers of the Government have never issued a decision sanctioning the incurring of an obligation for an open-ended indemnity in the absence of statutory authority to the contrary." *In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp. Gen. 361, 364–365 (1983). JUSTICE BREYER finds our reliance on the Comptroller General problematic because of a Comptroller General opinion that finds capped indemnity agreements not improper. *Post*, at 437–438. But the Anti-Deficiency Act applies equally to capped indemnification agreements. We do not suggest that all indemnification agreements would violate the Act, cf. *infra*, at 428–429 (citing

ing officer's presumed knowledge of its prohibition, as strong evidence that the officer would not have provided, in fact, the contractual indemnification Thompson claims. In an effort to avoid the Act's reach, Thompson argues that the Anti-Deficiency Act is not applicable to an implied-in-fact indemnity because such an indemnification is "judicially fashioned" and is "not an express contractual provision." Brief for Petitioners 41. However, "[t]he limitation upon the authority to impose contract obligations upon the United States is as applicable to contracts by implication as it is to those expressly made." *Sutton*, 256 U. S., at 580 (opinion of Brandeis, J.).

When Thompson contracted with the United States, statutory mechanisms existed under which a Government contracting officer could provide an indemnity agreement to specified classes of contractors under specified conditions. See, *e. g.*, 50 U. S. C. § 1431 (1988 ed., Supp. V) (permitting the President, whenever he deems it necessary to facilitate national defense, to authorize Government contracting without regard to other provisions of law regulating the making of contracts; in 1958, the President, in Executive Order No. 10789, delegated this authority to the Department of Defense, provided that the contracts were "within the limits of the amounts appropriated and the contract authorization therefor" and "[p]roper records of all actions taken under the authority" were maintained; in 1971, the President amended the Order to specify the conditions under which indemnification could be provided to defense contractors); 10 U. S. C. § 2354 (1956 statute authorizing indemnification provisions in contracts of a military department for research or development); 42 U. S. C. § 2210 (indemnity scheme, first enacted

---

statutes that expressly provide for the creation of indemnity agreements); the Act bars agreements for which there has been no appropriation. We consider open-ended indemnification in particular because that is the kind of agreement involved in this case.

in 1957, for liability arising out of a limited class of nuclear incidents, described in *Duke Power Co.* v. *Carolina Environmental Study Group, Inc.*, 438 U. S. 59, 63–67 (1978)). These statutes, set out in meticulous detail and each supported by a panoply of implementing regulations,[11] would be entirely unnecessary if an implied agreement to indemnify could arise from the circumstances of contracting. We will not interpret the DPA contracts so as to render these statutes and regulations superfluous. Cf. *Astoria Federal Sav. & Loan Assn.* v. *Solimino*, 501 U. S. 104, 112 (1991).[12]

We find unpersuasive Thompson's argument that § 707 of the DPA[13] reveals Congress' intent to hold harmless manufacturers for any liabilities which flow from compliance with an order issued under the DPA. Thompson reads the provision too broadly. The statute plainly provides immunity, not indemnity. By expressly providing a defense to liability,

---

[11] See, *e. g.,* 48 CFR § 235.070 (1994) (specifying criteria for indemnification clauses in Department of Defense research and development contracts); §§ 252.235–7000 to 252.235–7001 (contract language to be used for indemnification under 10 U. S. C. § 2354); 32 CFR § 7–303.62 (1983) (contract language to be used for indemnification under 50 U. S. C. §§ 1431–1435 (1988 ed. and Supp. V)).

[12] JUSTICE BREYER asserts that, by citing these statutes and regulations, "the majority implies that a contracting officer, in all likelihood, would not have agreed to an implicit promise of indemnity, for doing so would amount to a bypass of" the provisions. *Post,* at 436–437. We view the statutes and regulations, which cover different fields of Government contracting, not as implying what a contracting officer might have done with regard to the Agent Orange contracts, but as showing that a promise to indemnify should not be readily inferred.

[13] Section 707 provides, in relevant part:

"No person shall be held liable for damages or penalties for any act or failure to act resulting directly or indirectly from compliance with a rule, regulation, or order issued pursuant to this Act . . . notwithstanding that any such rule, regulation, or order shall thereafter be declared by judicial or other competent authority to be invalid." 50 U. S. C. App. § 2157 (1988 ed.).

Congress does not implicitly agree that, if liability is imposed notwithstanding that defense, the Government will reimburse the unlucky defendant.[14]   We think Thompson's reliance on *Ryan Stevedoring Co.* v. *Pan-Atlantic S. S. Corp.*, 350 U. S. 124 (1956), is likewise misplaced; there, in an action between private parties, we held that the stevedore was liable to the shipowner for the amount the latter paid in damages to an injured employee of the former.   Here Thompson claims a breach of warranty by its customer, not by its seller and supplier.

Perhaps recognizing the weakness of their legal position, petitioners plead "simple fairness," Tr. of Oral Arg. 3, and ask us to "redress the unmistakable inequities," Brief for Petitioners 40.   Fairness, of course, is in many respects a comparative concept, and the fact that the veterans who claimed physical injury from the use of Agent Orange could not recover against the Government, see *Feres* v. *United States*, 340 U. S. 135 (1950), considerably weakens petitioners' equitable appeal.   But in any event we are constrained by our limited jurisdiction and may not entertain claims "based merely on equitable considerations." *United States* v. *Minnesota Mut. Investment Co.*, 271 U. S., at 217–218.

For the foregoing reasons, the judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS took no part in the consideration or decision of this case.

---

[14] The United States urges us to interpret § 707 as only barring liability to customers whose orders are delayed or displaced on account of the priority accorded Government orders under § 101 of the DPA, which authorizes the President to require contractors to give preferential treatment to contracts "necessary or appropriate to promote the national defense." 50 U. S. C. App. § 2071(a)(1) (1988 ed., Supp. V).   We need not decide the scope of § 707 in this case because it clearly functions only as an immunity, and provides no hint of a further agreement to indemnify.

JUSTICE BREYER, with whom JUSTICE O'CONNOR joins, dissenting.

The petitioners, two chemical companies, have brought this breach-of-contract action seeking reimbursement from the Government for their contribution to the settlement of lawsuits brought by Vietnam veterans exposed to their product Agent Orange. The companies argue that their contracts with the Government to produce Agent Orange contain certain promises or warranties that, in effect, hold them harmless. To win this case, as in the most elementary breach-of-contract case, the companies must show that the Government in fact made the warranties or promises, that the Government breached them, and that the Agent Orange settlement contribution was a consequent foreseeable harm. See Restatement (Second) of Contracts §§ 346, 347, 351 (1979); 5 A. Corbin, Contracts §§ 997, 1001, 1002 (1964).

The companies concede that the promises, or warranties, are not written explicitly in their contracts; but, the companies intend to prove certain background facts and legal circumstances, which, they say, will show that these promises, or warranties, are an *implicit* part of the bargain that the parties struck. See 3 *id.*, §§ 538, 551 (common and trade usage, course of dealings, and existing statutes and rules of law are always probative as to the meaning of the parties).

The background facts alleged include the following:

• In the 1960's the Government, by exercising special statutory authority, required the companies to enter into the Agent Orange production contracts over the explicit objection of at least one of the companies. See Defense Production Act of 1950 (DPA), 50 U. S. C. App. § 2061 *et seq.* (1988 ed. and Supp. V); App. 8–9, 23–24.

• The Government required the companies to produce Agent Orange according to precise, detailed production specifications. *Ibid.*

• At that time the Government knew but did not reveal that Agent Orange was defective, or unsafe, to the point

where its use might lead to plausible tort claims advanced by those who used it. *Id.*, at 10–11, 25.

• The Government specified that the companies could not label Agent Orange in ways that might have promoted its safe use (with, say, dilution instructions), while, at the same time, the Government permitted its soldiers to use Agent Orange in unreasonably risky ways (such as using empty containers for showers or barbecues). *Id.*, at 8–10.

The background (1960's) legal circumstances include the following:

• *United States* v. *Spearin*, 248 U. S. 132 (1918), in which this Court approved the common judicial practice of reading Government contracts that provide detailed "plans and specifications," as containing an implied warranty that "the contractor will not be responsible for the consequences of defects in the plans and specifications." *Id.*, at 136.

• Lower court decisions reading Government contracts as containing an implied warranty that performance costs will not increase due to the Government's superior knowledge of undisclosed "vital information" that causes the cost increase. See *Helene Curtis Industries, Inc.* v. *United States*, 312 F. 2d 774, 777–778, and n. 1 (Ct. Cl. 1963) (collecting cases).

• The broad language of the statute that authorized the President to enter into defense procurement contracts—language broad enough to authorize Government promises to indemnify. 50 U. S. C. § 1431 (1988 ed., Supp. V); Exec. Order 10789, 3 CFR 426 (1954–1958 Comp.). See also Exec. Order 11610, 3 CFR 594 (1971–1975 Comp.) (taking view that the statute grants authority to promise indemnification).

• The language of the DPA, which, while permitting the Government to place compulsory defense orders, also says that the compelled firms shall not "be held liable for damages . . . for any act or failure to act resulting directly or indirectly from compliance with" such an "order." 50 U. S. C. App. § 2157 (1988 ed.).

These background facts and circumstances, say the companies, show that the Government knew far better than they that its Agent Orange contract specifications would force them to produce a risky product for risky use. They add that all parties knew of legal doctrines that made the Government responsible in analogous circumstances for analogous risks. They argue that the Government would not have wanted to *force* them (under the DPA) to enter into a contract subjecting them (through its specifications) to serious risks of damage, in respect to which (because of the Government's superior knowledge) they could not bargain for compensation. They conclude that the Government, in the contracts, took responsibility for those risks by implicitly promising to assume responsibility for the consequences of specification defects, including indemnification for the settlement of defect-related tort suits.

The Federal Circuit affirmed a grant of summary judgment against the companies. But, in doing so, it did not decide against the companies in respect to their claimed promises. Instead the Federal Circuit assumed (reluctantly and for argument's sake) that the companies would be able to prove the existence of the promises, but it went on to hold against them regardless. Even assuming the promises, the Circuit wrote, the companies will not be able to prove *causation* between promises and damages. The Circuit believed that, had the companies litigated the Agent Orange tort suits instead of settling them, they would have asserted a "government contractor defense," see *Boyle* v. *United Technologies Corp.*, 487 U. S. 500 (1988), and thereby won the lawsuits. It concluded that, since the companies could readily have won the suits, the settlement amounts to a "voluntary payment" that cuts any causal link between a broken promise, or warranty, and resulting harm.

The companies, in their petition for certiorari and initial brief on the merits, primarily asked us to review, and to re-

verse, this "no causation" holding. The Court, in today's opinion, does not discuss that holding. Instead it holds that the companies will not be able to prove the existence of the implicit promises. In my view, however, the record before us now does not permit this latter holding. Rather, this Court should reverse the Court of Appeals' "no causation" holding and then remand this case for further proceedings.

I need mention only one fatal flaw in the Court of Appeals' "no causation" holding, that of hindsight. The Court of Appeals, in essence, found the companies' Agent Orange settlement so obviously unnecessary, so abnormal, so far removed from ordinary litigation behavior, that it could not have been "foreseeable," see Restatement (Second) of Contracts § 351; 5 Corbin, Contracts § 1002, or (if I recast the same point in the Court's tort-like "causation" language) that it cut the causal link between promise breach and harm. But, viewed without the benefit of legal hindsight, the settlement was neither unforeseeable nor was it an intervening "cause" of the loss.

In 1984, when the companies settled, the settlement was not notably different in terms of reasonableness or motivation from other settlements that terminate major litigation, for at that time the law that might have provided the companies with a defense was far less clear than it is today. I concede that even then *some* Circuits already had found in the law a "government contractor defense" that, in effect, immunized defense contractors from most suits by servicemen claiming injury from defective products. See *McKay* v. *Rockwell International Corp.*, 704 F. 2d 444, 448–451 (CA9 1983), cert. denied, 464 U. S. 1043 (1984); *Brown* v. *Caterpillar Tractor Co.*, 696 F. 2d 246, 249–254 (CA3 1982); *Tillett* v. *J. I. Case Co.*, 756 F. 2d 591, 599–600 (CA7 1985). But, *most* of these Circuits had held that the existence of such a defense was a matter of state law, which might differ among the States. See *Brown, supra; Tillett, supra; Hansen* v. *Johns-Manville Products Corp.*, 734 F. 2d 1036, 1044–1045 (CA5

1984), cert. denied, 470 U. S. 1051 (1985). The Second Circuit, the home of the Agent Orange litigation, had not decided the issue. And, the two Agent Orange Second Circuit trial judges who (due to certain here irrelevant procedural considerations) *both* considered the companies' "government contractor" defense decided the issue in opposite ways. Compare *In re "Agent Orange" Product Liability Litigation*, 565 F. Supp. 1263, 1274–1275 (EDNY 1983), with *In re "Agent Orange" Product Liability Litigation*, 597 F. Supp. 740, 847–850 (EDNY 1984), aff'd, 818 F. 2d 145 (CA2 1987), cert. denied *sub nom. Fraticelli* v. *Dow Chemical Co.*, 484 U. S. 1004 (1988). This Court did not authoritatively uphold the "government contractor" defense until 1988, four years after the settlement here at issue. *Boyle, supra.* And, it did so on a ground different from that upon which the Circuit Courts had previously relied. Compare *McKay, supra*, at 448–451; *Tillett, supra*, at 596–597 (finding the "government contractor defense" implicit in *Feres* v. *United States*, 340 U. S. 135 (1950)), with *Boyle, supra*, at 509–511 (explicitly rejecting *Feres* as the basis for a "government contractor defense").

In light of this contemporaneous legal uncertainty, the settlement, viewed from the companies' perspective and without benefit of hindsight, seems a reasonable litigation strategy, through which the companies avoided added litigation costs and the threat of significant additional liability while helping to provide the veterans with at least some compensation. See *In re "Agent Orange,"* 597 F. Supp., at 749 (explaining why Agent Orange District Court approved the settlement). Nothing in the record here suggests the contrary. And, if reasonable at the time, the settlement must have been a "foreseeable" potential consequence of litigation and therefore within the scope of what the companies claim were implicit promises or warranties protecting them against the harms of litigation. See also 24 F. 3d 188, 205–208 (CA Fed. 1994) (Plager, C. J., dissenting). For that reason, this Court

simply should set aside the Court of Appeals' determination on the point.

The Court instead decides this case on an alternative basis, namely, that the companies cannot prove the existence of the implicit promises or warranties that they claim. But the existence of a contractual promise implied in fact is very much a creature of particular circumstance—the particular terms, the negotiating circumstances, and the background understandings of law or industry practice. See 3 Corbin, *supra*, §§ 562, 566–570. Unlike the majority, which compartmentalizes the companies' claims into several separate doctrinal categories (a "*Spearin*" claim, an implied indemnification claim)—each rejected separately for doctrine-specific reasons—I believe the companies' submissions, fairly read, also set forth a much more general fact-based claim. In essence, the companies say that the parties, when specifying the details of this compulsory defense order, implicitly agreed to allocate to the Government certain risks of defective-government-specification-caused harm—namely, those risks for which each company, because of its inferior knowledge, could not seek compensation in the contract price. And, the companies allege background facts that, *if true and complete* (as we must assume at this stage of the proceedings), make that implication plausible.

The legal considerations to which the majority points do not answer the companies' basic implied-in-fact contentions. To do so, the majority would have to argue that the five sets of legal circumstances to which it points, taken separately or together, show that no Government contracting officer would have agreed to a promise or warranty (of the sort claimed); hence, one cannot possibly imply the existence of such a promise "in fact." See 3 Corbin, *supra*, § 561. The majority cannot argue that, because those five sets of circumstances suggest the contrary.

First, the majority implies that a contracting officer, in all likelihood, would not have agreed to an implicit promise of

indemnity, for doing so would amount to a bypass of, and "render . . . superfluous," the statutes and "panoply of implementing regulations" that set forth specific procedures that contractors must follow to obtain a promise of indemnity. *Ante*, at 429. My problem with this argument lies in the fact that, in 1964, the *relevant* statute, Executive Order, and regulations read very differently. At that time, their language was nonspecific or ambiguous on the procedures required for indemnification. The *statute* has always been phrased in general language, making no explicit reference to indemnification. See 50 U. S. C. § 1431 (1988 ed., Supp. V); 50 U. S. C. § 1431 (1964 ed.). The portion of the Executive Order that today treats indemnification as special, and sets out procedures for indemnification, *did not exist* in 1964, and the relevant regulations were also either silent or much more ambiguous than they are today. Compare Exec. Order 11610, 3 CFR 594 (1971–1975 Comp.) (indemnification), with Exec. Order 10789, 3 CFR 426 (1954–1958 Comp.) (no specific reference to indemnification); compare 32 CFR § 17–301 *et seq.* (1975) (implementing today's indemnification procedures) with 32 CFR § 17–301 *et seq.* (1964) (no reference to indemnification procedures) and 32 CFR § 17.204–4 (1960) ("Informal commitments may be formalized under certain circumstances to permit payment to persons who have taken action without formal contract [*e. g.*, where a person has furnished property or services to the military in good-faith reliance on the apparent authority of a person giving an oral instruction]. Formalization of commitments under such circumstances normally will facilitate the national defense by assuring such persons that they will be treated fairly and paid expeditiously"); 32 CFR § 17.206(i) (1964) (indemnification contracts must subject Government's obligation to availability of appropriated funds).

Second, the majority points to Comptroller General opinions that say that an "open-ended" agreement to indemnify would violate the Anti-Deficiency Act, 31 U. S. C. § 1341 (1988

ed.). *Ante*, at 427, and n. 10 (citing *In re Assumption by Government of Contractor Liability to Third Persons—Reconsideration*, 62 Comp. Gen. 361 (1983)). The problem with this argument is that other Comptroller General opinions say that an agreement to indemnify that is *not* open-ended, but is capped at an amount that a private insurer might have provided, is *not* improper. See *Reimbursement of Costs in Connection with Liabilities to Third Parties for Employees' Negligence*, 22 Comp. Gen. 892 (1943). A capped agreement, which, if reflected in the contract price, makes the Government a kind of self-insurer, is in effect within the appropriation (because the expenditure of assuming the risk of liability will roughly equal the cost of premiums that the Government saves by self-insuring), and may well prove sufficient for the plaintiffs' purposes. After all, on plaintiffs' factual allegations, a contractor who was as aware of the plaintiffs' alleged risks as was the Government would have sensed trouble, wanted insurance, and likely have obtained a premium payment sufficient to buy it. The companies need argue only for a capped implicit warranty that would treat the unknowing contractor similarly. See also *In re Government Indemnification of Public Utilities Against Loss Arising Out of Sale of Power to Government*, 59 Comp. Gen. 705 (1980) (indemnification in contracts with a "sole source" of a good or service lawful under Anti-Deficiency Act). Whether an agreement to spend money beyond that which was appropriated is in writing or not is irrelevant to the Anti-Deficiency Act.

Third, the majority distinguishes *United States* v. *Spearin*, 248 U. S. 132 (1918), on the ground that the implied warranty that Justice Brandeis there discussed protects a contractor from "specifications" that, in the majority's words, will "frustrate performance or make it impossible," but does not "extend . . . beyond performance to third-party claims against the contractor." *Ante*, at 425. *Spearin* itself does not make this distinction. Nor have subsequent cases. See

*Michigan Wisconsin Pipeline Co.* v. *Williams-McWilliams Co.*, 551 F. 2d 945 (CA5 1977) (allowing recovery against the Government of damages paid by a Government contractor to a third party to which the contractor caused damage by following Government specifications). See also 24 F. 3d, at 197 (*Spearin* holds contractor harmless if the product proves defective). If the Government must pay, say, for the contractor's own machinery destroyed by a (defective-specification-caused) explosion when that destruction frustrates performance, see *Ordnance Research, Inc.* v. *United States*, 609 F. 2d 462, 479 (Ct. Cl. 1979) (treating explosions causing increased costs as a breach of the warranty of specifications), why should the Government not also have to pay when the explosion takes place just after performance is complete? And, why should it not have to reimburse the contractor's payment for identical damage caused his next-door neighbor in the same explosion? In any event, whether or not there are good answers to these questions, they are unlikely to answer plaintiffs' *further* argument, namely that, even if *Spearin* does not *compel* a decision in their favor, it offers indirect support, as background, for implying a promise that would provide (in the particular circumstances) *Spearin-like* protection.

Fourth, the majority says that the DPA's "hold harmless" provision ("No person shall be held liable for damages . . . for any act or failure to act resulting directly or indirectly from compliance with [an] order") does not provide for indemnification. *Ante,* at 429. The petitioners, however, do not claim the contrary. They state explicitly that they "do not attempt to interpret the DPA's hold harmless language as an affirmative indemnity." Reply Brief for Petitioners 2. They add that "an indemnity should be implied from all the circumstances of this case, including the circumstance that petitioners and the Government contracted against the backdrop of the sweeping hold harmless language contained in the DPA." *Ibid.* They argue simply that the DPA's stated

objective—to relieve them of involuntarily created liability—would have led contracting officers in the 1960's (given the parties' uncertainty about future statutory interpretation) to have believed that a contractual "hold harmless" warranty was reasonable in the circumstances, not the contrary. See 3 Corbin, Contracts § 551 (existing statutes and rules of law are always evidence of the meaning of the parties). The relevant point is not whether Congress intended to indemnify, but the likely effect of the DPA's language (before judicial interpretation limited it to an immunity provision) on what risks contracting officers at the time might have thought the Government was assuming in a *forced* production contract under the Act.

Fifth, both the Federal Circuit, 24 F. 3d, at 198, n. 8, and the majority, *ante*, at 425, imply that a 1960's contracting officer would not have accepted an indemnification provision because of *Stencel Aero Engineering Corp.* v. *United States*, 431 U. S. 666 (1977). That case held (in light of the *Feres* doctrine providing the Government with immunity from armed services personnel tort suits) that Government contractors, whom armed services personnel had sued in tort, could not, in turn, sue the Government for indemnification. Otherwise a soldier, unable (given *Feres*) to sue the Government for injury caused, say, by a defective rifle, would sue the rifle manufacturer instead, and the rifle manufacturer would then sue the Government for indemnity, thereby, in a sense, circumventing the immunity that *Feres* promised the Government.

One problem with this argument is that *Stencel* postdates the formation of the contracts here at issue by about a decade. More importantly *Stencel* does not involve *contractual promises* to indemnify a contractor. Rather it concerns an indemnification provided by state tort law. *Stencel, supra,* at 667–668, nn. 2, 3. And, it nowhere says, or directly implies, that the law prohibits the Government from agreeing, explicitly or implicitly, to indemnify a contractor. Indeed,

this Court has explicitly written that it "fail[s] to see how the *Stencel* holding . . . supports the conclusion that if the Tort Claims Act bars a tort remedy, neither is there a contractual remedy. The absence of Government tort liability has not been thought to bar contractual remedies on implied-in-fact contracts, even in those cases also having elements of a tort." *Hatzlachh Supply Co.* v. *United States*, 444 U. S. 460, 465 (1980) *(per curiam).* I agree with the majority insofar as it warns against a court's *too easily* reading an implicit promise to indemnify a contractor's armed-services-related tort liability; but, then, its words would represent simply a wise caution and not an absolute prohibition.

In sum, the companies argue factual circumstances—compelled production, superior knowledge, detailed specifications, and significant defect—which, if true, suggest that a government, dealing in good faith with its contractors, would have agreed to the "implied" promise, particularly in light of legal authorities, known at the time, that offered somewhat similar guarantees to contractors in somewhat similar circumstances. The validity of their claim is likely to turn on the strength of the companies' factual case, as supported by evidence, and upon the details of Government contracting practices in the 1960's—matters not now before us and with which the lower courts are more familiar than are we.

The Court today unnecessarily restricts *Spearin* warranties, and, lacking particular facts at this stage of the proceeding, it relies on statutory circumstances that are common to many Government contracts. I fear that the practical effect of disposing of the companies' claim at this stage of the proceeding will be to make it more difficult, in other cases even if not here, for courts to interpret Government contracts with an eye toward achieving the fair allocation of risks that the parties likely intended.

For these reasons, I would remand this case for further proceedings.