Cynthia Hamlin IRELAND, Plaintiff,

v.

SUFFOLK COUNTY OF NEW YORK, John and Jane Does 1 Through 10, Defendants.

Suffolk County Of New York, Third–Party Plaintiff,

v.

THE United States of America, the State of New York, George E. Pataki, Environmental Conservation of the State of New York, John P. Cahill, individually and as Commissioner of the Department of Environmental Conservation of the State of New York, Alexander F. Treadwell, individually and as New York Secretary of State, Fred Naffer, individually and as Director of the Flood Protection Bureau of the Department of Environmental Conservation of the State of New York, William Daly, individually and as Section Chief of Coastal Flooding and Erosion, Third-Party Defendants.

No. CIV.00–2412 DRH MLO.

United States District Court, E.D. New York.

Jan. 22, 2003.

Gary E. Ireland, New York City, Saul L. Glass, White Plains, NY, for Ireland.

Lewis, Johs, Avallone, Aviles & Kaufman, LLP, Melville, NY by Deborah A. Aviles, Christine Malafi, Esq., for Suffolk County.

Roslynn Mauskopf, Central Islip, NY by Charles P. Kelly, Charles S. Kleinberg, for the Eastern District of New York.

## MEMORANDUM & ORDER

HURLEY, District Judge.

Plaintiff seeks damages and injunctive relief against Suffolk County for the allegedly negligent design, installation and maintenance of stone groins on the beach near to her home. The United States, a third-party defendant in the action, filed a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. The United States argues that its conduct falls within 28 U.S.C. § 2680(a), an exception to the Federal Tort Claims Act that deprives this Court of subject matter jurisdiction. For the reasons discussed *infra*, the motion is granted solely as to the United States.

## I. BACKGROUND.

### A. Procedural Background.

Plaintiff Cynthia Hamlin Ireland ("Plaintiff") owns beachfront property in Sagaponack, New York. This property is near the region of eastern Long Island known as Georgica Pond. Located on the beach at Georgica Pond are two groins. Groins are "strong, low sea walls built at a right angle to the coast[line]" in order to reduce shore erosion. Shore erosion is prevented by capturing a portion of the sand contained in the "littoral drift," an ocean current that runs roughly parallel to the shore. The effectiveness of groins in preventing beach erosion is the subject of heated debate. There are also groins located on the beach in Westhampton. These Westhampton groins are not located near Plaintiff's property.

On April 27, 2000, Plaintiff initiated the instant action. The complaint alleges that Suffolk County ("County") was negligent by improperly designing, constructing and maintaining the Georgica Pond and Westhampton groins. This negligence, Plaintiff alleges, resulted in violations of the Fifth and Fourteenth Amendments of the United States Constitution, Article 1 of the New York State Constitution and of the Suffolk County Charter. Plaintiff claims to be a representative of a putative class composed of all beachfront landowners located west of the Georgica Pond groins.

At the suggestion of Magistrate Judge Orenstein, the County filed a third-party complaint against the United States of America ("United States"), the State of New York ("New York") and against certain individuals. In May 2002, the United States submitted a Rule 12(b)(1) motion to dismiss the third-party complaint for lack of subject matter jurisdiction.

B. The Background of the Long Island Groins.

In the early 1950's, Congress was concerned with the continuing threat posed to both lives and property in "the coastal and tidal areas of the eastern and southern United States from the occurrence of hurricanes." On June 15, 1955, Congress approved an "examination and survey" by the Secretary of the Army. The survey, "made under the direction of the Chief of Engineers," was to, in relevant part, recommend "possible means of preventing loss of human lives and damages to property, with due consideration of the economics of proposed breakwaters, seawalls, dikes, dams and other structures, warning services or other measures which might be required ..." Public Law 71, 84th Congress, 1955. The Army Corps of Engineers ("Corps of Engineers"), in cooperation with the State of New York, spent more than five years preparing this report.

On May 27, 1960, the Chief of Engineers submitted House Document 425, titled "South Shore of Long Island From Fire Island Inlet to Montauk Point, New York, Beach Erosion Control Study and Hurricane Survey" ("Long Island Report") to the Secretary of the Army. The Long Island Report discussed possible avenues of addressing beach erosion and tidal flooding during severe storms and hurricanes. On June 15, 1960, the Secretary of the Army transmitted the Long Island Report to the House of Representatives.

In relevant part, the Long Island Report was composed of the Report of the Chief of Engineers, the Report of the Board of Engineers for Rivers and Harbors, the Report of the Beach Erosion Board and the Report of the District Engineer. These individual reports all recommended (1) "[w]idening the beaches along developed areas between Kismet and Mecox Bay [including the Westhampton beaches] to a minimum width of 100 feet at elevation 14 feet above mean sea level"; (2) "[r]aising the dunes to an elevation of 20 feet above mean sea level from Fire Island Inlet to Hither Hills State Park at Montauk;" (3) "[p]lanting grass on the dunes;" (4) constructing no more than 50 groins, if needed, and (5) "[f]ederal participation in the *cost* of beach nourishment for a period not to exceed 10 years from the year of completion of a useful nourishment unit." [1] Long Island Report at 10 (Emphasis added). Beach nourishment involves the placement of sand fill at strategic places.

Notably, the Beach Erosion Board added an additional caveat to the recommendation that 50 groins should be constructed. Specifically, the Beach Erosion Board recommended that no groins be constructed "until it has been demonstrated to the satisfaction of the Board of Engineers that an adequate protective beach width cannot be maintained by beach nourishment alone." Long Island Report at 21.

The reports of the Board of Engineers for Rivers and Harbors and the Beach Erosion Board state that their recommendations are subject to those modifications that, in the exercise of discretion, the Chief of Engineers finds advisable. Similarly, the Report of the District Engineer was in the form of a recommendation to the Chief of Engineers. The District Engineer's report stated that "[n]o Federal contribution is authorized towards shore protection maintenance work." The District Engineer's report also stated that periodic beach nourishment was "the most suitable and economic remedial measure" and that the Chief of Engineers should specify a period, not to exceed ten years, in which

---

1. Additional recommendations not germane to the instant case are included in the Long Island Report.

some initial monetary aid would be provided to the local interests for this beach nourishment.

The Chief of Engineers "concur[red] generally" with the recommendations of the Beach Erosion Board and the Board of Engineers for Rivers and Harbors, as discussed *supra*, and provided for the general relief recommended by the District Engineer. However, the Chief of Engineers also qualified the recommended actions in two ways. First, the Chief of Engineers adopted the recommended action of the District Engineer "with such modifications thereof as in the discretion of the Chief of Engineers may be advisable." The Chief of Engineers also provided for the construction of 50 groins, if needed, conflicting with the Board of Erosion Control's recommendation. Finally, the Chief of Engineers also adopted the qualification, urged by all of the submitted reports, that the proposed project ("Project") be contingent upon certain assurances by local interests.

The Chief of Engineers recommended that the Project ought not be initiated unless, prior to initiation of construction, local interests provide satisfactory assurances that: (1) they would furnish without cost the lands, easements and rights of way necessary to complete the Project; (2) bear 49 percent of the cost of the Project; (3) hold the United States free from all damages due to the Project and (4) maintain the "works" resultant from the Project and provide periodic beach nourishment, excepting the costs assumed by the government over the first 10 years.[2] *Id.* at 11. This condition of local assurance was urged in all of the reports. The Secretary of the Army was left with the final determination of what constituted a satisfactory local assurance.

The Project was authorized by Section 101 of the Rivers and Harbors Act of July 14, 1960, P.L. 86–645, "in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the [Long Island Report]." After this authorization, the Chief of Engineers prepared General Design Memorandum No. 1, Moriches to Shinnecock Reach ("Moriches Memorandum")[3]. The Moriches Memorandum, dated September 1963, was presented to outline "all of the basic design, cost and economic data pertinent to the authorized [Project]." With regard to the contemplated groins for this reach, the Moriches Memorandum states that "[t]he function of the groin is to provide, to build and to widen the protective beach by trapping littoral drift." The Memorandum also states that "minor deviations from the authorized plan ... are considered to be within the discretion of the Chief of Engineers."

On August 14, 1963, New York State adopted the authorized Project without reservation. *See* Assurance of Local Cooperation ("Assurance"), U.S. ex. J. The Corps of Engineers formally accepted this Assurance on August 20, 1963. However, New York State was not obligated to pay the entire contribution. Suffolk County was obligated to pay some portion of the non-federal cost of the project. The County issued a resolution, *see* Suffolk County Resolution No. 75–1964 ("County Resolution"), U.S. ex. K, to address its concerns with the proposed Project.

---

2. The report discussed additional requirements of local assurance, though not important to the instant case, that are not listed in this order.

3. The term "reach" is used in the various documents to describe a discrete section of the beach. The Moriches Memorandum concerns a "reach" that includes the Westhampton beaches but does not include the beaches near Georgica Pond, the site of Plaintiff's property.

The County Resolution noted that the Project, as expressed in the Moriches Memorandum and the Long Island Report, called for "thirteen groins and for the placing of massive dredged [sand] fill . . . ." *Id.* The County Resolution further noted that the County's experience has been that the "fills have disappeared from the beaches within a few months after placement without evidence of any lasting value." *Id.* However, the County Resolution noted that the groins placed on County beaches "have been effective in accumulating sand that has maintained the beaches and contributed to the nourishment and building of the dunes." *Id.* Despite those reservations, the County resolved that: (1) the proposed groins be approved, (2) the consideration of placing sand fill be withheld until further study; (3) the Corps of Engineers "study, design and if possible include at least two groins in the critically eroded Georgica Bay section of East Hampton;" (4) "[t]hat the [County] will hold and save the State of New York and the United States free from damages due to the construction works" and (5) "[t]hat the [County] will maintain all the works."

In response to the County Resolution, the Corps of Engineers issued a Supplement to the Assurance of Local Cooperation ("Supplemental Assurance") dated April 20, 1964. The Supplemental Assurance stated that, "in recognition of the need for early protection of the South Shore of Long Island and in an effort to ease the immediate financial burden on local interests," it would recommend the construction of the eleven groins from the Moriches Memorandum and postpone the placement of sand fill "pending a determination of the amount of beach and dune stabilization achieved by the aforementioned groins." The Supplemental Assurance further provided for the construction of the two groins in the Georgica Pond area if there was a favorable finding by the Chief of Engineers, following a study. The Supplemental Assurance was accepted on April 27, 1964.

The required Georgica Pond study was completed in July 1964. *See* Report on Need and Design of Groins—Vicinity of Georgica Pond, East Hampton ("Georgica Report"), U.S. ex. M. The Georgica Report stated that "an analysis has been made and a need has been found for two groins in the vicinity of Georgica Pond . . . ."[4] *Id.* at 1. The Georgica Report did not provide for any artificial sand fill to be part of the initial groin construction. *Id.* at 26. The Georgica Report further stated that sand fill would not be added to the proposed groins for at least three years. *Id.* After three years, the sand fill would only be added "when found necessary by the Chief of Engineers." *Id.* The sand fill was to be provided by the "local interests," including the State of New York and the County. *Id.*

The two new[5] Georgica Pond groins were constructed in September 1965.

## II. DISCUSSION.

### A. Evidence Submitted in Support of the Motion.

█ Plaintiff contends that the United States' motion to dismiss "is a disguised

---

4. The Court notes that the final decision in the Georgica Report was not made without protest. "[T]he groins proposed by local interests, without coincident sand fill, will result in erosion of the down-drift beach to the west of the groin-field and will consequently increase the possibility of break-through in this reach during severe storms." Georgica Report at 34. This input did not dissuade the Chief of Engineers from finding that the groins were necessary.

5. There were apparently two stone groins already constructed in the Georgica Pond Area prior to the survey for the Georgica Report. *See* Georgica Report at 3.

motion for summary judgment, which should be denied in the absence of discovery." Plaintiff's complaint specifically references the Georgica Report. The County's third-party complaint specifically mentions the Long Island Report and the Georgica Report. Neither the Ireland complaint nor the third-party complaint reference the Moriches Memorandum, the subsequent assurances of cooperation or the relevant Suffolk County Public laws.

 The parties devote a large amount of time and effort debating whether this extra evidence merits the conversion of the motion into Rule 56 motion. These arguments are misguided. The Court is faced with Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. When subject matter jurisdiction is challenged under Rule 12(b)(1), "evidentiary matter may be presented by affidavit or otherwise." *Kamen v. American Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir.1986). Moreover, such a motion *cannot* be converted into a Rule 56 motion for summary judgment. *Id.* "Under Rule 12(b), a 'speaking' motion, i.e., a motion that includes evidentiary matters outside the pleadings, is properly converted to a Rule 56 motion only when it is made under Rule 12(b)(6): failure to state a claim." *Id.* at 1010–1011. The Second Circuit has noted that further discovery is required where facts *regarding subject matter jurisdiction* are "peculiarly within the knowledge" of the party opposing jurisdiction. *Id.* In the instant case, all of the disputed documents are matters of public record and not in the sole possession of a single party. Finally, the Second Circuit requires that all evidence submitted in connection with a Rule

12(b)(1) must be "competent." *Id.* There is no argument that these documents are in any manner "incompetent." As such, the Court will consider all of the submitted documents.[6]

## B. The Federal Tort Claims Act.

 Under traditional principles of sovereign immunity, the United States is immune from suit except to the extent the government has waived its immunity. In 1946, Congress adopted the Federal Torts Claims Act ("FTCA") which, subject to numerous exceptions, waives the sovereign immunity of the federal government for claims based on the negligence of its employees. *See* 28 U.S.C. §§ 1346(b), 2671 *et seq.* In relevant part, the FTCA authorizes suits against the government to recover damages for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred. 28 U.S.C. § 1346(b)(1).

 A significant limitation on the waiver of immunity provided by the Act is the exception known as the Discretionary Function Exception, 28 U.S.C. § 2680(a), which provides that Congress' authorization to sue the United States for damages "shall not apply to ... [a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of ...

---

**6.** Parenthetically, the Court notes that the Long Island Report, the governing act of Congress and the Georgica Report are all specifically referenced by the third-party complaint. As there is no dispute as to the content of these documents, they may be considered by the Court even if they were submitted in the context of a Rule 12(b)(6) motion. *See Nat'l Assoc. of Pharmaceutical Mfrs. v. Ayerst Labs.*, 850 F.2d 904, 911 n. 3 (2d Cir.1988) (documents referenced by complaint may be considered by court in Rule 12(b)(6) motion to dismiss).

an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The Supreme Court's decisions in *Berkovitz v. United States,* 486 U.S. 531, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988), and *United States v. Gaubert,* 499 U.S. 315, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991), establish the framework for evaluating whether particular governmental conduct falls under the Discretionary Function Exception. According to these cases, the Discretionary Function Exception bars suit only if two conditions are met: (1) the acts alleged to be negligent must be discretionary, in that they involve an "element of judgment or choice" not compelled by statute or regulation and (2) the judgment or choice in question must be grounded in "considerations of public policy" or susceptible to policy analysis. *See Gaubert,* 499 U.S. at 322–23, 111 S.Ct. 1267; *Berkovitz,* 486 U.S. at 536–37, 108 S.Ct. 1954.

1. Discretion Prong.

■ Discretion, as defined by the FTCA, does not turn on whether the decision was made at a planning or operational level. *Andrulonis v. United States,* 952 F.2d 652, 654 (2d Cir.1991). Rather, "discretion includes 'all choices or decisions that are based on considerations of public policy,'" *Gaubert,* 499 at 323, 111 S.Ct. 1267 (quoting *Berkovitz v. United States,* 486 U.S. 531, 537, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988)). "[T]he actions of Government agents involving the necessary element of choice and grounded in the social, economic, or political goals of the statute and regulations are protected." *Id.* As Justice Scalia points out, the FTCA's exclusion of liability for all acts of government employees performed with due care "in the execution of a . . . regulation, whether or not such . . . regulation be valid." 28 U.S.C. § 2680(a), "represents an absolute statutory presumption . . . that all regulations involve policy judgments

that must not be interfered with," *Gaubert,* 499 U.S. at 336–37, 111 S.Ct. 1267. Congress aimed to "prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic and political policy through the medium of an action in tort." *Gaubert,* 499 U.S. at 323, 111 S.Ct. 1267.

■ In the instant case, the Court examines the Corps of Engineers' discretion to build the Georgica groins as well as the discretion not to add sand fill. Congress' initial request for a report from the Chief of Engineers asked for "possible means of preventing loss of human lives and damages to property, with due consideration of the economics of proposed breakwaters, seawalls, dikes, dams and other structures, warning services or other measures which might be required . . ." Public Law 71, 84th Congress, 1955. The Long Island Report resulted from this congressional request. In the Long Island Report, the Chief of Engineers recommended (1) "[w]idening the beaches;" (2) "[r]aising the dunes;" (3) "[p]lanting grass on the dunes;" (4) constructing no more than 50 groins, if needed, and (5) "[f]ederal participation in the cost of beach nourishment for a period not to exceed 10 years." The Long Island Report also included the recommendations of the District Engineer, the Beach Erosion Board and the Board of Engineers for Rivers and Harbors that were considered by the Chief of Engineers in rendering the ultimate recommendation to Congress. The Chief of Engineers' ultimate recommendation only substantively differed from these reports in that it did not include the Beach Erosion Board's statement that no groins should be constructed "until it has been demonstrated to the satisfaction of the Board of Engineers that an adequate protective beach width cannot be maintained by beach nourishment alone." Still, the Chief of Engineers'

recommendation *did* provide for the building of groins only if they were determined to be necessary.

The Chief of Engineers' report also noted that the Project would proceed "generally in accordance with the plan of the District Engineer." However the Chief of Engineers also noted that the Project would be subject to "such modifications thereof as in the *discretion* of the Chief of Engineers may be advisable." (Emphasis added). The Chief of Engineers also adopted the qualification making the Project contingent upon assurances by local interests.

After the Long Island Report was submitted, the Project was authorized by Congress via Section 101 of the Rivers and Harbors Act of July 14, 1960, P.L. 86–645. This authorization called for the Project to proceed "in accordance with the plans and subject to the conditions recommended by the Chief of Engineers in the [Long Island Report]." Nothing in this authorization narrowed the terms of the Report.

Similarly, the Long Island Report *only* allowed the Corps of Engineers to complete those parts of the Project for which the local interests rendered adequate assurances. The adequacy of these assurances were left to be determined by the Chief of Engineers.

The question of whether a beach erosion project conducted by Corps of Engineers falls within the Discretionary Function Exception to the FTCA was answered affirmatively in this district by Judge Seybert, who adopted the report and recommendation of Magistrate Judge Azrack on this issue. *See Devito v. United States,* 12 F.Supp.2d 269 (E.D.N.Y.1998) (Seybert, J.); *DeVito v. United States,* No. 95–CV–2349, 1997 WL 1038120 (E.D.N.Y Sept. 5, 1997) (Azrack, M.J.). In *Devito,* plaintiffs sought money damages under the FTCA for the accelerated erosion of their beachfront property which was allegedly caused by Corps of Engineers projects undertaken in an effort to stabilize the South Shore of Long Island. *See Devito,* 12 F.Supp.2d at 269–70. The United States successfully asserted that the Discretionary Function Exception deprived the court of subject matter jurisdiction. *See id.* at 270. *Devito* involved the identical act of Congress, Section 101 of the Rivers and Harbors Act of July 14, 1960, P.L. 86–645, as is implicated in the instant case. *See DeVito v. United States,* No. 95–CV–2349, 1997 WL 1038120, at *5 (E.D.N.Y.1997) (Azrack, M.J.).

*Devito* has provided persuasive support to another Eastern District Judge confronted by similar circumstances. *See Vaizburd v. United States,* 90 F.Supp.2d 210 (E.D.N.Y.2000) (Trager, J.). In *Vaizburd,* the plaintiff's claims rose from damage done to their home and property as a result of the allegedly negligent design and implementation of a storm damage reduction and shoreline protection project on the Coney Island beachfront. *See id.* at 211. In *Vaizburd,* Judge Trager held that the applicable statutes vested discretion in the Corps of Engineers and that the discretion was exercised with reference to valid policy considerations. *Id.* at 214–215. In so holding, Judge Trager specifically relied upon Devito. *See id.* It is unclear whether *Vaizburd* involved Section 101 of the Rivers and Harbors Act of July 14, 1960.

To counter *Devito* and *Vaizburd,* Plaintiff cites *Kennedy v. United States,* 643 F.Supp. 1072, 1081 (E.D.N.Y.1986) (Wexler, J.). That case did indeed refuse to apply the FTCA to a similar fact situation. However, in that case Judge Wexler, noting that the FTCA issue was merely raised as a collateral issue to the Rule 12(b)(6) motion, concluded that neither facts nor briefing were complete on the issue. Here, the FTCA was the primary grounds

for the motion to dismiss. As discussed *infra*, there is no contention that further discovery is needed regarding the issue of the Corps of Engineers' decision-making. Moreover, the Court does not solely rely upon *Devito* and *Vaizburd* to reach its decision.

To varying degrees both Plaintiff and the County contend that the Corps of Engineers was bound to the express terms of the Long Island Report. Any deviation from the Project outlined in that report, it is argued, was a decision that exceed their discretion. The Court's review of the applicable documents does not lead to the same conclusion.

In the instant case, the Long Island Report, adopted by Congress via Section 101 of the Rivers and Harbors Act of July 14, 1960, P.L. 86–645, expressly allows the Chief of Engineers to build groins if necessary. The Georgica Report clearly stated that the Chief of Engineers had found the Georgica groins to be "necessary." With regard to the decision to not provide sand fill, the Long Island Report only allows the Chief of Engineers to implement those portions of the Project for which adequate assurances of cooperation are provided by the local interests. In the instant case, the County expressly stated that it would not pay for the sand fill portion of the project. Given the language of the Long Island Report, the Chief of Engineers not only was permitted to not perform those sections of the Project for which it did not receive adequate assurances of local support, the Chief of Engineers affirmatively could *not* perform those sections of the Long Island Report that did not receive

concomitant assurances of local cooperation. Therefore, the Corps of Engineers was not required, where local assurances could not be provided, to provide sand fill in addition to the groins. Finally, with regard to both the sand fill and the placement of the Georgica groins, the Long Island Report expressly provides that the Project was subject to "such modifications thereof as in the discretion of the Chief of Engineers may be advisable." This phrase provides even broader discretion than the language discussed above. All of this evidence, taken cumulatively demonstrates that the Corps of Engineers possessed discretion to alter the Long Island Report in the manner demonstrated by the record.[7]

In light of the foregoing discussion, the Court finds that the first prong of the *Gaubert* test is satisfied. 499 U.S. at 325, 111 S.Ct. 1267; *see also United States v. 2606.84 Acres of Land in Tarrant County, Texas*, 432 F.2d 1286, 1292 (5th Cir.1970) (preliminary report by Corps of Engineers is "only a preliminary feasability report and [is] not binding on [either] the Corps or the Secretary of the Army.").

### 2. Policy Prong.

 The second *Gaubert* prong would be satisfied if the Corps of Engineers decisions were susceptible to policy analysis. *Gaubert*, 499 U.S at 325, 111 S.Ct. 1267. The Georgica Report contained both the decisions to add the two groins for the Georgica Pond area as well as the decision to withhold the placement of sand fill until a finding that it is necessary. The same Georgica Report express-

---

7. The County urges that the Coastal Zone Management Act ("CMZA"), 16 U.S.C. §§ 1451, et seq., requires the Corps of Engineers to follow a New York state law requiring no increase in erosion. The County however, provides no cases applying the CMZA in this manner. Moreover, the Georgica groins were completed in 1965. The statute that supposedly limits the Corps of Engineers' discretion, State of New York Coastal Management Program & Impact Stmt., Section 6, August 1982, was enacted in 1982. The County provides no argument why the Corps of Engineers would be limited in its discretion by a state statute that would not be enacted for another 17 years.

ly states that the Corps of Engineers' decision to alter the Project as outlined therein was made "in recognition of the need for early provision of erosion protection on the South Shore of Long Island and in an effort to ease the immediate financial burden on the local interests . . . ." Georgica Report at 39. The identical rationale was expressed in the Supplement to Assurance of Local Cooperation. *See* U.S. ex. L. The Court is aware it should not focus upon the "subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert*, 499 U.S at 325, 111 S.Ct. 1267. Nonetheless, it is important to note that this statement provides evidence that the Corps of Engineers' subjectively intended to engage in policy analysis. The Court now turns to whether the Corps of Engineers' decisions are objectively susceptible to policy analysis.

Plaintiff cites two cases for the proposition that these circumstances are not the type for which policy decisions are allowed. Plaintiff first cites *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018 (9th Cir.1989). In *Kennewick*, the Ninth Circuit held that, while decisions regarding the design of irrigation canals are excluded from the FTCA, decisions made during the construction of the canal were not excluded from the FTCA. *Id.* at 1028. Plaintiff also cites *Andrulonis*, 952 F.2d 652. *Andrulonis* involved the decision of a doctor to not warn researchers of the risks involved with research regarding the anthrax virus. *Id.* at 653. In that case, the Second Circuit held that the negligent omission of information regarding easily-correctable dangers was not a decision that was susceptible to policy analysis. *Id.* at 655. These cases are distinguishable from the instant case. These cases both involve decisions that were made during the physical implementation of a project. In *Kennewick* the challenged conduct occurred during construction, 880 F.2d at 1028, while *Andrulonis* involved a decision not to warn researchers of risks inherent in an ongoing, active research project, 952 F.2d at 653. By way of comparison, in the instant case the challenged decisions were made prior to initiation of construction. In fact, the challenged decisions involved planning the ultimate form that the approved Project would take. These decisions are susceptible to policy analysis. *Gaubert*, 499 U.S. at 325, 111 S.Ct. 1267 ("there is no doubt that planning-level decisions establishing programs are protected by the discretionary function exception.")

Plaintiff and the County also cite several cases for the proposition that, once a discretionary project has been initiated, there is no discretion to cease maintaining the project. *See ARA Leisure Servs. v. United States*, 831 F.2d 193 (9th Cir.1987) (failure to maintain a road bed); *Appley Bros. v. United States*, 164 F.3d 1164 (8th Cir. 1999); *Eklof Marine Corp. v. United States*, 762 F.2d 200 (2d Cir.1985) (once the government has acted to mark an reef it must mark it correctly); *Denham v. United States*, 834 F.2d 518 (5th Cir.1987) ("Once the government does undertake to supply a service, then it must be held responsible for negligent acts in supplying the service."); *E. Ritter & Co. v. Dep't of Army Corps of Engineers*, 874 F.2d 1236 (8th Cir.1989) (failure to maintain ditch)[8].

---

**8.** Plaintiff also cites *Driscoll v. United States*, 525 F.2d 136 (9th Cir.1975), for the proposition that the Discretionary Function Exception is inapplicable to the maintenance of project undertaken by the Corps of Engineers. However, citation is only to the arguments of the parties and not to the holding of the Court. Likewise Plaintiff also cites to *Ducey v. United States*, 713 F.2d 504 (9th Cir.1983). That case expressly involved no discussion of the Discretionary Function Exception. In

The only Second Circuit authority cited by Plaintiff and the County is *Eklof.* This case does not aid the Court's analysis. In that case, pursuant to common law and 14 U.S.C. § 81, the Coast Guard had discretion whether to place markings on maritime dangers. *Eklof,* 762 F.2d at 202. The Second Circuit held that the Coast Guard's discretion, when elected, must be exercised with due care. *Id.* at 205. In short, this case had no connection with the FTCA.

The remaining cases are similarly unavailing. In *ARA Leisure,* the Ninth Circuit held that since the failure to maintain a roadway was in violation of an established agency regulation, the decision to not maintain the road was not susceptible to policy analysis. 831 F.2d at 195. This is very similar to the facts in *Appley,* where the Eighth Circuit held that the United States could not assert the Discretionary Function Exception when it failed to follow an established U.S.D.A. regulation. 164 F.3d at 1173. In the instant case, neither the construction of the groins or the decision to not place sand fill was in violation of an established regulation. (Though the Court is aware that participation in the cost of beach nourishment was provided in the Long Island Report, that report, due to the discretion inherent therein, is not analogous to an established agency regulation.) *Denham* involved concrete blocks placed in the water at a swimming area operated and maintained by the Corps of Engineers. 834 at 519. In the instant case, there is significant doubt that the Corps of Engineers was ever required to maintain the relevant groins and beaches. In fact, the assurances of local cooperation expressly state that the State and County will operate and maintain the beaches and groins. Moreover, the *Denham* court relied upon an operation/planning distinction that has since been invali-

dated by the Supreme Court's decision in *Gaubert. See id.* at 521; *see also Gaubert,* 499 U.S. at 322–325, 111 S.Ct. 1267. In *E. Ritter,* the Army Corps of Engineers, which retained the duty to maintain, not only failed to maintain a flood control ditch but also failed to insure the plaintiff of a cost-sharing policy and repeatedly assured the plaintiff that the problem would be fixed. 874 F.2d at 1241. In the instant case, as discussed *supra,* the County and New York state both expressly stated that they would maintain "all the works" associated with the Project. Though Court notes that the County now disputes that they have any obligation to maintain the groins, the existence of these documents purporting to relieve the Corps of Engineers from any duty to maintain the groins and beaches is notable. Moreover, The Long Island Report expressly limited the Corps of Engineers' involvement in maintenance and "beach nourishment" to only "costs" and only for a period not to exceed ten years. Nothing in the record indicates that this limitation was altered.

The County also contends that the Corps of Engineers' exercise of discretion was not susceptible to policy analysis because it was based upon cost concerns. *See Phillips v. United States,* 956 F.2d 1071 (11th Cir.1992); *ARA Leisure,* 831 F.2d 193. After careful review of the cited case law, the Court does not find this argument persuasive. *Phillips* involved the United States negligence liability for the failure of the Corps of Engineers to inspect scaffolding on an Airforce base. 956 F.2d at 1073. This case involved specific safety manuals and regulations that required the Corps of Engineers to inspect these scaffolds. *Id.* at 1074–1075. Nowhere in the opinion is "cost" considered to be an invalid grounds for a policy decision. In fact, "cost" is not mentioned at all in this decision. Likewise, the only capaci-

fact, it remanded the case to the District Court for findings on the issue.

ty that "cost" was discussed in *ARA Leisure* was the statement that "the fact that Park Service maintenance personnel were required to work within a budget does not make their failure to maintain [the road in a safe condition] a discretionary function for the purposes of the FTCA." 831 F.2d at 195. The instant case does not involve the requirement of working within a budget. Rather, the Chief of Engineers noted that the alterations found in the Supplemental Assurance were made "in recognition of the need for early protection of the South Shore of Long Island *and* in an effort to ease the immediate financial burden on local interests." Supplemental Assurance, U.S. Ex. L. At the minimum, this statement reveals that more than monetary concerns were considered by the Corps of Engineers.

 Finally, Plaintiff contends that the Corps of Engineers' decisions in the instant case are not susceptible to policy analysis because the record demonstrates that they acquiesced to the demands of a private citizen, Mr. Juan Trippe. The submitted evidence of this citizen's "improper" influence is a letter, dated August 24, 1964, from the Chief of Engineering Division for the Corps of Engineers ("Chief") to the Commissioner of Public Works for the County ("Commissioner"). *See* Plaintiff's Ex. F. To refresh the memory, this letter was sent after the Supplemental Assurance was signed by the State and County but prior to the issuance of the Georgica Report finding a necessity for groins at Georgica Pond. In that letter, the Chief forwarded a "sketch of the recommended locations of the groins at Georgica Pond." The letter also recommended that the County take no action to acquire any lands because the Chief of Engineers had not yet found a necessity for the proposed Georgica groins. From Plaintiff's perspective, the damning part of the letter occurs when the Chief states: "It is also my understanding that Mr. Juan Trippe was arranging to have the County acquire the lands at minimum cost. Should you now wish to move the groins, I would appreciate your coordinating the matter with Mr. Trippe."

This communication, according to Plaintiff, rendered the decision to not follow the full plan outlined in the Long Island Report an act that is "not entitled to the protection of the [D]iscretionary [F]unction [Excep]tion." Plaintiff provides no case law for this specific proposition. Plaintiff merely provides the cryptic comment that "Can it safely be said that Congress would not be disturbed to find that the [Corps of Engineers] greatly truncated its grand project, and located groins to suit Juan Trippe, and not its own engineers." The Court is not persuaded.

Plaintiff's evidence has merely raised the possibility that Mr. Trippe may have aided the County in acquiring the lands necessary for the groins. There is no indication that this aid predated the County Resolution which demanded the Georgica Groins. The Chief's mere awareness of Mr. Trippe's involvement does not render the Corps of Engineers' decisions invalid. Moreover, assuming *arguendo* that Mr. Trippe's alleged influence tainted the County's decision-making, there is no case law for the proposition that the alleged taint carries over to the Corps of Engineers's exercise of discretion. In fact, 28 U.S.C. § 2680(a) provides that the Discretionary Function Exception shall apply "whether or not the discretion involved be abused." Finally, as clearly expressed in the letter, the final decision of whether there was a necessity for the Georgica Groins was in the hands of the Chief of Engineers. There is no indication at all that the Chief of Engineers had knowledge of Mr. Trippe's existence. In sum, while the Court does reach the issue of whether there is a circumstance in which the improper involvement of an individual might

possibly invalidate the United States' reliance on the Discretionary Function Exception, the facts of the instant case simply do not support such a finding.

Despite the many arguments presented by Plaintiff and the County, the instant facts present the Court with a decision that readily comports with policy analysis. To paraphrase the Second Circuit from *In Re Agent Orange Product Liability Litigation,* 818 F.2d 194 (2d Cir.1987): At issue is a decision of the Army Corps of Engineers' highest superiors that was designed to aid waterfront homeowners in their struggle with hurricane erosion. 818 F.2d at 200. The planning of a project is the classic case of a decision that is susceptible to policy analysis. *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267. The contrary authority cited by the County and by Plaintiff has failed to convinced the Court otherwise.

## C. Claims for Equitable Relief.

■ Plaintiff argues that the Court should continue to maintain all equitable claims against the United States. In support of this argument, Plaintiff relies on *Larson v. Domestic and Foreign Commerce Corp.,* 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), for the proposition that an executive officer might not be shielded from suit when he acted unconstitutionally or beyond his statutory powers. This case, and its accompanying argument, fail to persuade the Court. Specifically, *Larson* held that an executive officer may be enjoined from continuing to enforce a constitutionally infirm statute or regulation. 337 U.S. at 691, 69 S.Ct. 1457. That species of equitable relief bears little relation to the relief sought in the instant case. In the instant case, Plaintiff and the County seek an equitable remedy forcing the United States, not an officer thereof, to remove the offending Georgica groins and to provide massive beach nourishment (through sand fill added to the damaged

beaches and dune rehabilitation). Comparing the actual *Larson* holding to the instant facts, Plaintiff's argument carries little persuasive weight.

In addition, Plaintiff cites *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), for the proposition that "recovery in the Court of Claims is not available if the taking private property for public use is unauthorized." This statement appears accurate. *See id.* at 127 n. 165, 95 S.Ct. 335. However, the Court cannot ascertain the purpose of stating the limits to the Court of Claims' jurisdiction in the context of this argument.

## D. Supplemental Jurisdiction Over Claims Against the United States.

■ The County's brief on the exercise of supplemental jurisdiction is perplexing. After raising the issue of supplemental jurisdiction, the County's memorandum devotes three pages to discussing permissive and compulsory joinder. *See* County's Memorandum at 8–10. As alleged, the County states that it is statutorily barred from providing the relief sought by Plaintiff. As such, the County argues that complete relief cannot be granted unless the United States is joined as a party. This is a requirement under the compulsory joinder provision, Fed.R.Civ.P. 19(b), of the Federal Rules. The County argues that, since Rule 19(b) seems to compel joinder, there are "compelling reasons and exceptional circumstances that warrant the exercise of jurisdiction." Presumably, when the County speaks of "jurisdiction" in this context, it is referring to supplemental jurisdiction. The Court is not persuaded.

■ This argument fails to account for the underlying reason that the Court lacks subject matter jurisdiction over the United States in this context. The Court's subject matter jurisdiction over the United States exists only to the extent that the United States has waived its sovereign

immunity. *See Hercules, Inc. v. United States,* 516 U.S. 417, 422–423, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996); *see also* Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3654 p. 269 (3d Ed.1998). Supplemental jurisdiction, as codified in 28 U.S.C. § 1367, does not constitute a waiver of sovereign immunity. Neither does Rule 19(b). As such, the Court will not utilize supplemental jurisdiction in the instant case.

E. The Flood Control Act.

As discussed *supra,* the Court has held that the exception to the FTCA, codified at 28 U.S.C. § 2680(a), is implicated by the Corps of Engineers' actions in this case. As such, the Court does not reach the issue of whether the Flood Control Act, 33 U.S.C. § 702(c), applies to the facts of the instant case.

## III. CONCLUSIONS.

For the reasons discussed *supra,* the Corps of Engineers' exercise of allowable discretion in a manner that is susceptible to policy analysis triggers the exceptions to the FTCA, codified at 28 U.S.C. § 2680(a). Since the challenged actions of the Corps of Engineers fall into the Discretionary Function Exception of the FTCA, the Court does not have subject matter jurisdiction over the claims raised against the United States. *See Merritt v. Shuttle, Inc.,* 245 F.3d 182, 192 (2d Cir. 2001). As such, all of the claims against the United States are DISMISSED. This decision does not reach the remainder of the third-party complaint, asserting claims against the State of New York as well as against individuals working for the state.

**SO ORDERED.**